BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:  (858) 914-2002
E-mail:    fbottini@bottinilaw.com
           achang@bottinilaw.com

*Attorneys for Plaintiff Weining Hu*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEINING HU, derivatively on behalf of GINKGO BIOWORKS HOLDINGS, INC., a Delaware corporation,<br><br>                                      Plaintiff,<br><br>              vs.<br><br>ELI BAKER, ARIE BELLDEGRUN, MARIJN DEKKERS, SCOTT M. DELMAN, MARK DMYTRUK, CHRISTIAN HENRY, JASON KELLY, RESHMA KEWALRAMANI, ISAAC LEE, TIMOTHY LEIWEKE, DENNIS A. MILLER, LAURENCE E. PAUL, SHYAM SANKAR, RESHMA SHETTY, HARRY E. SLOAN, JOSHUA KAZAM, and DOES 1–10,<br><br>                                      Defendants,<br><br>              - and -<br><br>GINKGO BIOWORKS HOLDINGS, INC.,<br><br>                          Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**(1) BREACH OF FIDUCIARY DUTY;**<br>**(2) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>**(3) VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934;**<br>**(4) UNJUST ENRICHMENT; AND**<br>**(5) CONTRIBUTION AND INDEMNIFICATION.**<br><br><u>DEMAND FOR JURY TRIAL</u> |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Table of Contents**

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................9

III.   DIVISIONAL ASSIGNMENT .........................................................................10

IV.    PARTIES ...........................................................................................................10

       A.     Plaintiff ...................................................................................................10

       B.     Nominal Defendant .................................................................................10

       C.     Individual Defendants .............................................................................11

       D.     The Doe Defendants ...............................................................................14

V.     FACTUAL ALLEGATIONS.............................................................................15

       A.     Soaring Eagle Formed as a Blank Check Company to Perform a Reverse
              Merger Acquisition of an Unidentified Target Company............................15

       B.     SRNG Identifies Ginkgo as Merger Target and Claims Due Diligence
              Supports Ginkgo Valuation of $ 15 Billion.....................................................17

       C.     Defendants Caused Ginkgo and Soaring Eagle to File a Materially False
              and/or Misleading Proxy Statement and Other Materially False and/or
              Misleading SEC Filings ...........................................................................19

       D.     False and/or Misleading Linked Company Transactions
              and Statements .......................................................................................19

       E.     False and/or Misleading Foundry Business Statements.............................25

       F.     False and Misleading Transparent Operations Statements ........................25

       G.     False and Misleading Cronos Statements....................................................27

       H.     Defendant Kelly Issued and Caused Ginkgo to Issue Other Materially
              False and/or Misleading SEC Filings .............................................................28

       I.     Shareholders Approve the Ill-Informed and Ill-Advised Merger through
              the Deficient Proxy ................................................................................31

       J.     Defendants' False and/or Misleading Statements are Exposed to Public
              Scrutiny by Third Party Reports...............................................................32

VI.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES...............................42

A.   General Duties as Directors and Officers ........................................................42

B.   The Duty of Reasonable and Prudent Supervision......................................44

VII.   BREACHES OF FIDUCIARY DUTIES ..................................................................45

VIII.   CONTROL, ACCESS, AND AUTHORITY..............................................................46

IX.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ......46

X.   DAMAGES TO GINKGO.........................................................................................47

XI.   DERIVATIVE ALLEGATIONS ...............................................................................48

A.   Demand Is Excused Because the Individual Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment ......................................49

B.   Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the False and Misleading Statements .........................51

C.   Demand Is Excused Because Certain Director Defendants Received a Material Personal Benefit from the Alleged Misconduct ..........................56

XII.   CLAIMS FOR RELIEF..............................................................................................57

XIII.   PRAYER FOR RELIEF .............................................................................................62

XIV.   DEMAND FOR JURY TRIAL ..................................................................................63

Plaintiff Weining Hu ("Plaintiff"), a current shareholder of Ginkgo Bioworks Holdings, Inc. ("Ginkgo" or the "Company"), by and through her undersigned counsel, brings this shareholder derivative action against certain present and former directors, officers and controlling shareholders of Ginkgo in connection with their breaches of fiduciary duties and violations of the federal proxy laws.  In support of these claims, Plaintiff alleges the following (1) upon personal knowledge with respect to the matters pertaining to Plaintiff and Plaintiff's ownership of Ginkgo stock; and (2) upon information and belief with respect to all other matters, based upon the investigation undertaken by counsel, which included, *inter alia*, (a) a review of the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) news articles, conference call transcripts, analysts' reports, and press releases; and (c) other publicly available information pertaining to Ginkgo and the topics addressed herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.     This is a shareholder derivative action to remedy the wrongdoing committed by the Individual Defendants from May 11, 2021 through the present pertaining to their failure to fully, fairly, properly and timely:

a)     disclose the relevant facts necessary for Ginkgo's stockholders, and Soaring Eagle SPAC's stockholders, to cast an informed vote regarding the desirability of Ginkgo's merger with the Soaring Eagle SPAC, formed as a blank check company for the sole purpose of acquiring an ongoing, functional business with strong free cash flow;

b)     disclose the identities of related-party companies and the nature and extent of those interconnected relationships;

c)     file corrective disclosures regarding identities of related-party companies and the nature and extent of those interconnected relationships

so as to make the previous disclosures not misleading;

d)    file corrective disclosures with the SEC that present accurate and non-misleading information regarding Ginkgo's business and financial relationships with related party companies; and

e)    disclose the accurate sources, amounts and levels of free cash flow independent of self-financed and related-party financed pre-payments and transactions.

2.    Ginkgo is a biotechnology company, incorporated in Delaware in 2008, with California offices located in this Judicial District at 5858 Horton Street, Emeryville, California 94608.  Its corporate headquarters are located at 27 Drydock Avenue, 8th Floor, Boston, Massachusetts 02210.

3.    Ginkgo promotes itself as a synthetic biology company, dubbing itself online as "the Organism Company."

4.    Fundamentally, however, Ginkgo primarily provides monetized engineering of a commonly used yeast strain.  Similar to many of its competitors in the biological engineering field, Ginkgo has "been devoted to developing *P. pastoris* into a chassis for the production of various high-value compounds, such as natural products."[1] An MIT based article on Ginkgo from 2016 describes the process as follows: "Inside the foundry, Ginkgo engineers use software and a database of thousands of unique enzymes to design new biological instructions for yeast. . . . Ginkgo then licenses the organisms to partners, who, in turn, use fermentation to manufacture and extract

---

[1] "The methylotrophic yeast *Pichia pastoris* (a.k.a. *Komagataella phaffii*) is one of the most commonly used hosts for industrial production of recombinant proteins. As a non-conventional yeast, *P. pastoris* has unique biological characteristics and its expression system has been well developed. With the advances in synthetic biology, more efforts have been devoted to developing *P. pastoris* into a chassis for the production of various high-value compounds, such as natural products." *See* "Development of synthetic biology tools to engineer *Pichia pastoris* as a chassis for the production of natural products," THE NATIONAL LIBRARY OF MEDICINE, available at https://pubmed.ncbi.nlm.nih.gov/33997361/, last visited Apr. 12, 2023.

the chemicals for their own clients."[2]

5.      Ginkgo's business consists of two parts: the initial manufacturing and production arm of the Company, called the "Foundry," and the warehouse and retail arm of the Company, called the "Codebase."

6.      As noted above, the Foundry is essentially a yeast strain engineering lab where Ginkgo provides manufacturing capability and R&D services to other companies.

7.      When the Foundry efforts are successful, the Codebase is a storage hub of the strains Ginkgo has produced and the data it has retained about those strains. Through licenses, companies then have access to these genetically modified strains for their specific business purposes. "French fragrance manufacturer Robertet, for example, contracted Ginkgo to design yeast that produces a rose scent."[3]

8.      Ginkgo went public on September 17, 2021 via a reverse merger with the Soaring Eagle special purpose acquisition company ("SPAC").  Soaring Eagle registered as a SPAC offering with the SEC on Form S-4 pursuant to the Securities Act.  The final proxy and registration statement filed on August 4, 2021, the body of which was incorporated into the prospectus filed on Form 424(b)(3) on August 13, 2021, together with information filed as a supplement to that registration statement pursuant to Rule 425 adopted in accordance with the Securities Act, is hereinafter referred to collectively as the "Deficient Proxy."

9.      The Deficient Proxy described Ginkgo's business as operating "in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services."

10.      This was false and misleading. Ginkgo and/or Ginkgo's three largest outside investors at the time – Viking Global, Cascade, and General Atlantic, who

---

[2]  *See*  https://phys.org/news/2016-08-yeast-fragrances-flavors-efficiently.html,  last visited Apr. 12, 2023.

[3] *Id.*  It is unclear if the collaboration succeeded in producing a yeast-based rose scent.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        3

collectively owned 42.8% of Ginkgo – provided the vast majority of funds that were recirculated by related-party companies back to Ginkgo as "charge[s] for services."

11.    Synlogic, Allonnia, Genomatica, Joyn Bio, Kalo Ingredients LLC/Arcaea and Motif Foodworks, all Ginkgo-related and/or Ginkgo reabsorbed companies, recirculated funds from Ginkgo and/or Ginkgo's investors back to Ginkgo as "revenue" and are hereinafter referred to as the "Linked Companies."

12.    For example, in 2019 Ginkgo paid related-party Synlogic (ticker symbol "SYBX") approximately $80 million for Synlogic stock and warrants that were valued at $50 million.  Simultaneously, Ginkgo and Synlogic entered into an agreement whereby Synlogic would return to Ginkgo the $30 million overpayment as a "nonrefundable prepayment for Foundry services."  By paying more than fair market value for SYBX shares/warrants, and then converting that overpayment into a $30 million "nonrefundable prepayment" for R&D services, Ginkgo created a $30 million income stream that consists entirely of a recirculation of its own funds.

13.    Each of Ginkgo's related-party arrangements varied in the particulars, but all created the false and misleading appearance of arms' length business transactions, as further detailed below.  As a result of misclassifying Linked Company transactions, the Individual Defendants improperly inflated outside customer revenue streams, undercounted intra-company revenue, and misstated the robustness and reliability of its revenue streams.

14.    These additional Linked Companies and their related transactions included:

a)    **Allonnia**. Allonnia is a company that was and is housed in Ginkgo's Boston office building and that lists Ginkgo employees, including Defendant Kelly and Ginkgo's one-time Head of Ventures and current advisor, Jason Kakoyiannis, as its former managers and current board members.  In 2019, Allonnia received $33 million in financing

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    4

principally from Ginkgo's largest investors, and recirculated those funds back to Ginkgo for R&D services in amounts that were misleadingly out of line with Allonnia's limited number of employees.

b)      **Genomatica**.  Through an investment round facilitated by Ginkgo's largest investor, Viking Global, Ginkgo received $40 million worth of Genomatica preferred stock in exchange for agreeing to provide Genomatica with $40 million of R&D services at no charge.  Those amounts were misleadingly out of proportion with Genomatica's actual R&D needs: Ginkgo recognized $6.2 million from Genomatica in 2019 and $9.4 million in 2020.

c)      **Joyn Bio**.  Joyn Bio was a joint venture between Ginkgo and Bayer, that is still housed in, and subsumed by, Ginkgo's Boston office, and at relevant times listed Defendants Kelly and Shetty as managers.  In large part, Ginkgo's funding for the venture came from an undisclosed Ginkgo related party.  At the completion of formation, Joyn Bio channeled $20 million in cash back to Ginkgo as a "nonrefundable prepayment" for technical services.  In 2019, despite not expending the initial $20 million prepayment, Joyn Bio made a similar $15 million prepayment to Ginkgo. In October 2022, Joyn Bio was reintegrated "into Ginkgo Bioworks to enable the continued advancement of Joyn Bio's innovative nitrogen fixation platform.  As part of the agreement, Bayer retains the right to commercialize the technology to complement synthetic fertilizer use in the coming years."[4]

d)      **Kalo Ingredients, LLC ("Kalo"), currently Arcaea**.  "Arcaea was

---

[4] *See* "Bayer and Ginkgo Bioworks close deal creating Agricultural Biologicals Powerhouse," NEWS DETAILS, Oct. 18, 2022, available at https://investors.ginkgobioworks.com/news/news-details/2022/Bayer-and-Ginkgo-Bioworks-close-deal-creating-Agricultural-Biologicals-Powerhouse/default.aspx.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    5

incubated on the Ginkgo Bioworks platform and formed under the name Kalo Ingredients LLC."[5] Kalo was formed in March 2021 and listed Ginkgo's Boston address as its principal office, and Ginkgo employees as its managers. Upon formation it received financing from Ginkgo's own investors, and a mere sixteen days after formation Ginkgo claimed to have booked $11.9 million in deferred revenue from Kalo, which appears to have been Ginkgo investor funds recirculated back to Ginkgo in the form of prepayments.

e) **Motif FoodWorks ("Motif")**. Motif is another related and inter-twined "customer" of Ginkgo that is housed at Ginkgo's Boston office address, listed Defendant Shetty as its corporate agent, and lists Defendants Kelly and Jason Kakoyiannis as its directors. Ginkgo investors lead a $90 million preferred stock investment in Motif. Then Motif, in a convoluted, misleading transaction, issued Ginkgo common stock, then worth $65.1 million. That common stock, in turn, served as a prepayment for R&D services and licensing and was booked as deferred revenue by Ginkgo. Ginkgo recognized revenue of $20.8 million from Motif in 2020 and $19.0 million in 2019.

15. The Linked Companies and Ginkgo frequently cycled through or shared employees and/or invested in each other. For example, Dayal Saran, a program director at Ginkgo, performed executive roles at three of the Linked Companies: Motif, Synlogic, and Allonnia. And, Jasmina Aganovic, CEO of Linked Company Arcaea, joined Ginkgo as an Entrepreneur-in-Residence, seemingly for the purpose of forming a related

---

[5] *See* "Arcaea, a Company Launched on the Ginkgo Bioworks Platform, Announces $78M Series A To Build a New Foundation For the Beauty Industry through Expressive Biology," PR NEWSWIRE, Oct. 27, 2021, available at https://www.prnewswire.com/news-releases/arcaea-a-company-launched-on-the-ginkgo-bioworks-platform-announces-78m-series-a-to-build-a-new-foundation-for-the-beauty-industry-through-expressive-biology-301409534.html.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                6

company focusing on beauty and skincare products. Further, Genomatica swapped equity, cash and intellectual property with an affiliate of Joyn Bio.

16. The false statements and omissions in the Deficient Proxy about Ginkgo's convoluted Linked Company transactions made it impossible for shareholders and investors to understand: (a) the degree to which related-party arrangements were sleight-of-hand transactions designed to repatriate into Ginkgo, as revenue and deferred revenue, funds from Ginkgo's own large investors; (b) the actual value of services performed and promised; (c) the actual cash flows from Ginkgo's operations; (d) the percent of revenues that reflected non-Linked Company transactions similar to the cloud services and CROs with which Ginkgo compared its operations when wooing investors and stockholders; (e) whether the Linked Companies were independent, as opposed to functionaries of Ginkgo; (f) the amount of non-related party revenue Ginkgo generated; (g) whether Ginkgo had high free cash flow potential, identified to Soaring Eagle investors and stockholders as a goal for a merger candidate; or (h) Ginkgo's overall economic prospects and accurate valuation as a public company.

17. The Deficient Proxy also misleadingly concealed material problems and otherwise failed to disclose issues or correct disclosure of issues involving the few transactions that did not involve related parties. For example, the Deficient Proxy highlighted the potential of a license that Ginkgo sold to cannabis manufacturer Cronos to manufacture lab-grown cannabinoids, but failed to disclose that the license was not providing the expected value to Cronos, which said its license from Ginkgo became impaired in August of 2021, and consequently had to write down the value of its Ginkgo license.[6]

18. The Individual Defendants had a duty to properly investigate and report

---

[6] "The difference between the consideration paid to Ginkgo [on August 21, 2021] and the fair value of the exclusive license intangible asset of $1,784 was recognized as an impairment charge on the consolidated statements of net income (loss) and comprehensive income (loss) for the year ended December 31, 2021." Cronos 2022 10-K, p. 97.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    7

the correct financial position of Ginkgo so that shareholders could fairly evaluate the stability, viability, and valuation of the Company when asked to approve the merger or otherwise invest in the Company.  Through their statements in the Deficient Proxy, the Individual Defendants falsely and misleadingly stated that they had done so, and further stated that the shareholders were to rely *solely and exclusively* on the Individual Defendants' statements in the Deficient Proxy when deciding whether to approve the merger, retain or liquidate their shares, approve a slate of directors and/or to invest in Ginkgo.

19.    Based on the information in the Deficient Proxy, Soaring Eagle investors/ shareholders had to evaluate whether to approve the reverse merger acquisition of Ginkgo.  In addition, the shareholders needed to decide, regardless of the shareholders' votes on the merger, whether to approve the slate of new Ginkgo directors consisting largely of former Ginkgo directors and the Individual Defendants named herein, whether to retain Soaring Eagle shares and allow them to be converted to Ginkgo shares, or to redeem their Soaring Eagle shares for $10/share and thereby divest themselves of a future interest in Ginkgo.

20.    On September 14, 2021, 97% of the participating Soaring Eagle shareholders voted to approve the merger with Ginkgo, and less than half of those shareholders redeemed shares.  Because Defendants breached their fiduciary duties by causing the Deficient Proxy to be filed, they were successful in persuading enough shareholders to keep the number of redemptions below a set threshold, the cash contingency was satisfied, and the merger closed, grossing over $1.6 billion in proceeds for the largest going-public biotech company transaction ever.

21.    Had the transaction failed, the Individual Defendants stood to lose significant amounts of money.  The Individual Defendants repeatedly breached their fiduciary duty of loyalty by obtaining for themselves improper personal financial benefits and causing the Company to file false financial statements.  As a result of their

misconduct, the Individual Defendants are liable to the Company for breaches of fiduciary duties as well as other related violations of federal and state laws.

## II.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

23.    This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.    This Court has jurisdiction over Defendants.  Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.  Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.  The Court has jurisdiction over Ginkgo because Ginkgo has an office in Emeryville, California, and has business operations in California.

25.    Venue is proper in this District in accordance with Section 27 of the Exchange Act.  Venue is also proper under 28 U.S.C. § 1391(b) because: (i) Ginkgo maintains a place of business in, and has significant contacts with, this District; (ii) one or more of the Defendants resides in this District; (iii) a substantial portion of the transactions and wrongs complained of in this complaint occurred in this District; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    9

(iv) Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had effects in this District.

### III.       DIVISIONAL ASSIGNMENT

26.     In compliance with Local Rule 3-5(b), Plaintiff respectfully requests that this action be assigned to the Oakland Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Alameda, and because a related action, *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, Case No. 4:21-cv-8943-KAW (N.D. Cal.), is currently pending in the Oakland Division.

### IV.       PARTIES

#### A.     Plaintiff

27.     Plaintiff Dr. Weining Hu, MD/PhD is a current Ginkgo shareholder and has continuously held Ginkgo stock at all relevant times.  Previously, Plaintiff owned Soaring Eagle stock prior to the SPAC transaction, as a result of which she received Ginkgo stock.  Plaintiff is a citizen of Minnesota.

#### B.     Nominal Defendant

28.     Nominal defendant Ginkgo is a Delaware corporation headquartered at 27 Drydock Avenue, 8th Floor, Boston, MA 02210, with an office in Emeryville, CA. Ginkgo is a biological technology company that claims to help "partners grow key ingredients for vaccines, crops that rely less on fossil fuel-based fertilizers, plant-based meat that tastes like the real thing, materials for the next generation of circular fashion, and so much more."[7]  Ginkgo's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DNA."  Prior to merging with Ginkgo, Soaring Eagle was a SPAC listed on the NASDAQ under the ticker symbol "SRNG," and was initially formed in December 2020 as an entity named Spinning Eagle before changing its name to Soaring Eagle.  Ginkgo is a citizen of Delaware, Massachusetts, and California.

---

[7] *See* https://www.linkedin.com/company/ginkgo-bioworks/, last visited Apr. 12, 2023.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    10

## C.    Individual Defendants

29.    Defendant Eli Baker ("Baker") was the Chief Financial Officer ("CFO"), co-founder, and Secretary of Soaring Eagle.  Defendant Baker signed the Deficient Proxy. The Deficient Proxy detailed Baker's previous positions with earlier Eagle-related SPACs, and indicated that Baker was a Partner in Eagle Equity Partners, a group that at one time owned millions of shares of the Company's stock.  Baker is a citizen of California.

30.    Defendant Arie Belldegrun ("Belldegrun") was listed in the Deficient Proxy as a director of the merged Company.[8]  Defendant Belldegrun is a current director of Ginkgo and serves on the Compensation Committee.  According to the Deficient Proxy and related filings, Belldegrun advised the Soaring Eagle Defendants regarding negotiations, investigations and due diligence for the proposed merger with Ginkgo. Ginkgo's 2022 Proxy Statement indicated that Belldegrun received $16,563 in fees for Board service for the partial year 2021 post-merger.  The 2022 Proxy listed Belldegrun as owning 522,489 class A Common Stock shares of the Company.  Belldegrun is a doctor at the UCLA Institute of Urologic Oncology at the David Geffen School of Medicine at UCLA, and is a citizen of California.

31.    Defendant Marijn Dekkers ("Dekkers") was listed in the Deficient Proxy as a director of the merged Company.  Defendant Dekkers is a current director of Ginkgo and is the current Chairperson of the Board and has served on the Board and as the Chairperson of the Board since 2019, pre- and post-merger.  Ginkgo's 2022 Proxy Statement indicated that Dekkers received $30,533 in fees (partial year) and $30,430,090 in stock awards (full grant-date value of RSUs) for Board service for the year 2021 post-merger.  The 2022 Proxy listed Dekkers as owning 7,902,030 class A Common Stock shares of the Company.  Dekkers is a citizen of New Hampshire.

---

[8] *See* 424B3 Proxy Filing with SEC at 163 for the full listing of proposed directors to serve on the new board of Ginkgo.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    11

32.     Defendant Scott M. Delman ("Delman") was a Director of Soaring Eagle. Defendant Delman signed the Deficient Proxy. Delman is a citizen of New York.

33.     Defendant Mark Dmytruk ("Dmytruk") serves as the CFO of Ginkgo, and has served in that position since November 2020 (pre-merger). Ginkgo's 2022 Proxy Statement indicated that Dmytruk, as one of the three "named executive officers," received in 2021 total compensation of $40,068,678.[9] This represents over 601 times his 2020 total compensation from the Company of $66,611 and over 100 times his estimated annualized 2020 total compensation. The 2022 Proxy listed Dmytruk as owning 674,494 class B Common Stock shares of the Company. Dmytruk is a citizen of Massachusetts.

34.     Defendant Christian Henry ("Henry") was listed in the Deficient Proxy as a director of the merged Company. Defendant Henry has served as a director of the Company since 2017, pre- and post-merger, and is a current director of Ginkgo, the current Chair of the Audit Committee and a member of the Compensation Committee. Ginkgo's 2022 Proxy Statement indicated that Henry received $22,323 in fees (partial year) and $20,000,194 in stock awards (full grant-date value of RSUs) for Board service for the year 2021 post-merger. The 2022 Proxy listed Henry as owning 1,305,943 class A Common Stock shares of the Company. Henry is the CEO of Pacific Biosciences and was previously the CFO and COO at Illumina. He is a citizen of California.

35.     Defendant Jason Kelly ("Kelly") was listed in the Deficient Proxy as a director of the merged Company. Defendant Kelly, along with Defendant Shetty and non-defendants Tom Knight, Barry Canton and Austin Che, co-founded Ginkgo in 2008. At all relevant times pre- and post-merger, Kelly has served as Ginkgo's CEO and as a director of the Company. Ginkgo's 2022 Proxy Statement indicated that Kelly, as one of the three "named executive officers," received in 2021 total compensation of $380,742,276.[10] This represents over 36 times his 2020 total compensation from the

---

[9] $425,000 salary + $39,629,178 stock awards + $14,500 other comp. 2022 Proxy at 37.

[10] $250,000 salary + $380,479,776 stock awards + $12,500 other comp. 2022 Proxy at 37.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    12

Company of $10,533,188. The 2022 Proxy listed Kelly as owning 82,431,106 class B Common Stock shares of the Company, representing 16.4% of the total voting power of the Company. Kelly has also served as a director of CM Life Sciences II Inc. (Nasdaq: CMII), a special purpose acquisition company with a focus on the life sciences sector, since its initial public offering in February 2021. Kelly is a citizen of Massachusetts.

36. Defendant Reshma Kewalramani ("Kewalramani") is a Director of Ginkgo, has been a director at all times since the merger of the company with Soaring Eagle, and approved the filing of the Deficient Proxy. Defendant Kewalramani is a citizen of Massachusetts.

37. Defendant Isaac Lee ("Lee") was a Director of Soaring Eagle. Defendant Lee signed the Deficient Proxy. Lee is a citizen of California.

38. Defendant Timothy Leiweke ("Leiweke") was a Director of Soaring Eagle. Defendant Leiweke signed the Deficient Proxy. Leiweke is a citizen of California.

39. Defendant Dennis A. Miller ("Miller") was a Director of Soaring Eagle. Defendant Miller signed the Deficient Proxy. Miller is a citizen of California.

40. Defendant Laurence E. Paul ("Paul") was a Director of Soaring Eagle. Defendant Paul signed the Deficient Proxy. Paul is a citizen of California.

41. Defendant Shyam Sankar ("Sankar") was listed in the Deficient Proxy as a director of the merged Company. Defendant Sankar has served as a director of the Company since 2015, pre- and post-merger and is a current director of Ginkgo, the current Chair of the Compensation Committee, and a member of the Audit Committee and the Nominating and Corporate Governance Committee. Ginkgo's 2022 Proxy Statement indicated that Sankar received $20,163 in fees (partial year) and $20,625,832 in stock awards (full grant-date value of RSUs) for Board service for the year 2021 post-merger. The 2022 Proxy listed Sankar as owning 1,260,953 class A Common Stock shares of the Company. Sankar is also the Chief Technology Officer at Palantir Technologies Inc. Sankar is a citizen of Texas.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    13

42.    Defendant Reshma Shetty ("Shetty") was listed in the Deficient Proxy as a director of the merged Company.  Defendant Shetty, along with Defendant Kelly and non-defendants Tom Knight, Barry Canton and Austin Che, co-founded Ginkgo in 2008. At all relevant times pre- and post-merger, Shetty has served as Ginkgo's President and COO and as a director of the Company. Ginkgo's 2022 Proxy Statement indicated that Shetty, as one of the three "named executive officers," received in 2021 total compensation of $380,742,276. [11]  This represents over 36 times her 2020 total compensation from the Company of $10,533,733.  The 2022 Proxy listed Shetty as owning 165,841,730 class B Common Stock shares of the Company, representing 32.9% of the total voting power of the Company.  The only other individual or entity with equal voting power is listed on the 2022 Proxy as Bartholomew Canton, Ginkgo's Chief Technology Officer. Collectively, Defendants Kelly and Shetty control 49.3% of the voting power of the Company.  Shetty is a citizen of Massachusetts.

43.    Defendant Harry E. Sloan ("Sloan") was listed in the Deficient Proxy as a director of the merged Company.  He served as the CEO and Chairman of Soaring Eagle.  Defendant Sloan signed the Deficient Proxy.  Sloan is a citizen of California.

44.    Defendant Joshua Kazam ("Kazam") was a Director of Soaring Eagle. Defendant Kazam signed the Deficient Proxy through his authorized attorney-in-fact, Defendant Sloan.  Kazam is a citizen of New York.

45.    Defendants Baker, Belldegrun, Dekkers, Delman, Dmytruk, Henry, Kelly, Kewalramani, Lee, Leiweke, Miller, Paul, Sankar, Shetty, Sloan, and Kazam are sometimes referred to herein as the "Individual Defendants."

**D.    The Doe Defendants**

46.    Various other individuals, partnerships, corporations, and other business entities have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The true names and capacities, whether

---

[11] $250,000 salary + $380,479,776 stock awards + $12,500 other comp. 2022 Proxy at 37.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    14

individual, corporate, associate, or otherwise of Defendants Does 1 through 10, inclusive, are unknown to Plaintiff currently.  Plaintiff therefore sues Defendants Does 1 through 10 by such fictitious names.  Plaintiff further alleges that each of the Doe Defendants is responsible for the acts and occurrences hereinafter set forth.  Plaintiff will amend this complaint to (a) show their true names and capacities when such information is ascertained; and (b) allege how each Doe Defendant is responsible for the damages sustained by Ginkgo and its shareholders.

## V.    FACTUAL ALLEGATIONS

47.    Throughout the Relevant Period, the Individual Defendants made and caused Ginkgo to make materially false and misleading statements about Ginkgo, its business, its relationships and transactions with customers, and its financial condition. These misstatements occurred concurrent with the concealment of the Company's deficient internal controls and policies, particularly with respect to related entities and revenue streams, as noted herein.

### A.    Soaring Eagle Formed as a Blank Check Company to Perform a Reverse Merger Acquisition of an Unidentified Target Company

48.    Soaring Eagle (ticker: SRNG) originally registered itself as Spinning Eagle Acquisition Corp. but later changed its name to Soaring Eagle Acquisition Corp.  It was a SPAC formed as a Cayman Islands corporation in December 2020 for the purpose of merging with, and taking public, a business to be identified by its managers.  SRNG described itself as a "blank check company."[12]

49.    SPACs are complex companies that are registered by sponsors with the SEC, exist for a finite period of time (two years is typical), and either identify and merge with an existing private company or liquidate and forfeit the sponsors' funds within

/ / /

/ / /

---

[12] *See, e.g.,* Form S-1 filed with the SEC on December 23, 2020.

that period of time.[13]  Functionally, SPACs are non-operational companies that act like bank trust accounts for the accumulation of money from the public, typically but not exclusively financially savvy institutional investors, that are then used to acquire the later-identified target company through a reverse merger.

50.    Some private companies see SPAC mergers as less onerous, expensive and time-consuming methods of going public than using traditional Initial Public Offerings ("IPOs").[14]

51.    The managers/sponsors of a SPAC, sometimes called founders, invest nominal amounts of money in the SPAC yet gain a disproportional number of shares in the SPAC compared to other shareholders' investments. The SRNG initial/founder shareholders invested $25,000, or .002% of the expected capital contribution of all shareholders, and received 37,500,000 shares, or 20% of the full allotment of shares.[15] SRNG founders included Defendants Sloan and Baker, and founder investments/shares may have included, directly or indirectly, other SRNG related Defendants.

52.    The prospect of gaining a huge windfall profit for consummating the SPAC merger with Ginkgo put the SRNG managers/sponsors in a position to prefer their own interests over those of the public shareholders. And that's exactly what the Individual Defendants did.

53.    From the beginning, SRNG encouraged investors to set aside valid concerns about investing in a "blank check company" by emphasizing the business experience and skills of SRNG's Board of Directors and promising that it would focus

---

[13] *See* "What You Need to Know About SPACs – Updated Investor Bulletin," available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin, last visited Apr. 12, 2023; *see also* John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021).

[14] *Id.*

[15] Form S-1 Registration Statement, filed on December 23, 2020, at 95.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                16

on a target company with the "potential to generate strong and stable free cash flow."[16]

## B. SRNG Identifies Ginkgo as Merger Target and Claims Due Diligence Supports Ginkgo Valuation of $15 Billion

54. On May 11, 2021, Ginkgo and SRNG issued a joint press release announcing the merger. In a rule 425 filing with the SEC on the same day, Defendants acknowledged that "any information that is material to the shareholder approval of the merger by Soaring Eagle shareholders will have to be publicly disclosed." Yet material information was not disclosed. They also acknowledged that "SRNG's and Ginkgo Bioworks and their respective directors and officers may be deemed to be participants in the solicitation of proxies from SRNG's stockholders in connection with the proposed transaction." All Individual Defendants are and were directors and/or officers of SRNG and/or Ginkgo during all relevant times.

55. The Deficient Proxy filed with the SEC in August 2021 asserted that the Defendants had conducted extensive due diligence of Ginkgo's operations:

> Before reaching its decision, the SRNG Board reviewed the results of the due diligence performed on Ginkgo, which included: . . .
>
> - Extensive meetings (virtually and in-person) and calls with the Ginkgo management team  and  representatives regarding operations, company services, major customers, financial prospects, the pipeline of potential new programs and applications and possible acquisitions, among other customary due diligence matters;
>
> - "Channel checks" or interviews with Ginkgo's customers in different industries, including but not limited to pharma, agriculture, manufacturing, and consumer products;
>
> * * *
>
> - Legal and commercial review of Ginkgo's material business contracts and certain other legal and commercial due diligence;
>
> * * *
>
> - Financial and accounting due diligence; and
>
> - Financial analysis of Ginkgo with assistance of its financial advisors, including a sensitivity analysis based on key drivers to Ginkgo's business.[17]

---

[16] *See, e.g., Id.* at 3-7, 98.

[17] Deficient Proxy at 115-6.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    17

56. Without seeking a third-party valuation and based upon their claimed "experience in investing" and "due diligence," the Individual Defendants asserted that Ginkgo warranted an astronomical valuation of $15 billion.[18]

57. SRNG and Ginkgo management met on several occasions in March, April and May 2021 to discuss aspects of the proposed merger. Defendant Belldegrun specifically participated in the May 7, 2021 SRNG Board meeting wherein the merger with Ginkgo was approved.[19]

58. Defendants claimed that SRNG's outsized valuation was conservative and "applied sensitivities to a number of variables" to offset uncertainties.[20] Further, Defendants communicated to investors that they concluded merging with Ginkgo at a $15 billion valuation was "in the best interests" of SRNG shareholders, and **"UNANIMOUSLY RECOMMEND[ED] THAT SRNG SHAREHOLDERS VOTE 'FOR' THE APPROVAL"** of all proposals relating to the merger.

59. The Deficient Proxy explicitly directed investors to refrain from conducting their own due diligence, and instead to rely *exclusively* on the information that the Defendants incorporated into the Deficient Proxy: "You should rely only on the information contained or incorporated by reference into this proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this proxy statement/prospectus."

/ / /

/ / /

---

[18] *Id.* at 113, further stating that "[t]he valuation was based on a number of factors including fundamental analysis by SRNG, the competitive nature of the process in which Ginkgo had received term sheets from a number of other [unnamed] special purpose acquisition companies, and a mutual desire to raise a successful PIPE and minimize redemptions prior to closing."

[19] *Id.* at 113-4.

[20] *Id.* at 118.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    18

**C.   Defendants Caused Ginkgo and Soaring Eagle to File a Materially False and/or Misleading Proxy Statement and Other Materially False and/or Misleading SEC Filings**

60.   The Deficient Proxy contained false statements of material fact and omitted to state other facts necessary to make the statements, under the circumstances in which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. Defendants' failure to disclose, supplement and/or correct these material facts constitutes a breach of their fiduciary duties.

61.   The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.   As noted above, the Defendants acknowledged this duty of disclosure in their SEC filings and admitted that all Defendants were considered solicitors of proxies under the Exchange Act and the SEC regulations.

**D.   False and/or Misleading Linked Company Transactions and Statements**

62.   The Deficient Proxy described Ginkgo's Linked Company undertakings as follows:

> Platform Ventures allow leading multinationals to partner with Ginkgo and financial investors to form new ventures in identified market segments with potential to benefit from synthetic biology. In exchange for an equity position in the venture, we contribute license rights to our proprietary cell programming technology and intellectual property, while our partners contribute relevant industry expertise, other resources and venture funding.

63.   These statements were materially false and misleading when made because "leading multinationals" other than Joyn Bio did not participate in Ginkgo's Platform Ventures.   Instead, Platform Ventures was an elaborate name given to investment vehicles created and controlled by Ginkgo, funded either by Ginkgo or Ginkgo's investors, and operated to funnel investments back onto Ginkgo's books.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    19

64. With respect to Motif, the Deficient Proxy stated that Motif "represented more than 10% of our total revenue" and misleadingly stated that Ginkgo "is not the primary beneficiary of Motif as it does not control the decisions that most significantly impact Motif's economic performance," including "development activities."

65. The Deficient Proxy included the following chart emphasizing the work Ginkgo claimed to have done for Motif:

GINKGO STORIES

## Together with Motif, we're engineering proteins to produce healthier, more sustainable food options

**What if our food could be more accessible, healthier, harm-free, and have a lower environmental impact?**

Ginkgo partnered with Motif FoodWorks to develop commercial yeast strains and processes for protein production at the kilogram scale. The target protein would be used to make foods more delicious and sustainable.

Leveraging our Codebase and Foundry, **Ginkgo's engineers studied and screened 300+ distinct candidate proteins** in order to identify candidates with the greatest functional benefit.

Following the screening process, top performing proteins were **engineered with novel expression systems to maximize their expression in optimized strains**.

**Scale**

**Q1** — Identify potential proteins

**Q2** — Screen for best candidate protein

**Q3** — Strain engineering & pathway balancing

**Q4** — Iterative strain construction & testing

**1 year** — Prototype strains ready

We developed 6 strains, and produced samples for benchmarking and early application testing. We designed, built, and validated improved variants over the next 9 months. The final chassis strains substantially improved the unmodified chassis strains, **increasing productivity, reducing cost, and improving scalability** over rounds of engineering.

**2 years** — Commercial strains

Ginkgo developed commercial strains from scratch with a total projected 3 years time-to-market for the final food product. **The strain's performance exceeded Motif's specifications by greater than 70%.** We also identified a set of novel protein expression systems that exceed performance of best-in-class systems by 5-20 fold.

66.     These statements were materially false and misleading when made because they omitted that Ginkgo did in fact exercise control over Motif, including its development activities, because: (i) its principal development activities were conducted by Ginkgo in Ginkgo facilities using Ginkgo tools; (ii) Ginkgo executives Kelly and Kakoyiannis served as directors of Motif; (iii) Ginkgo placed a Ginkgo employee as Director of Motif's R&D, and his role was to funnel "R&D spend" back to Ginkgo; (iv) Ginkgo tied Motif into non-refundable long-term prepaid foundry services contracts making it financially impracticable for Motif to use other providers; (v) Ginkgo executives publicly emphasized the development activities they were conducting for Motif; and (vi) no statement mentioned that Ginkgo's purported accomplishment for Motif was the result of stealing the patented invention of Heme owned by Impossible Foods, not merely by "Leveraging our Codebase and Foundry."

67.     Defendants also included a chart in their Deficient Proxy that claimed receipt of "highly predictable," "upfront" revenue:



Figure 12: Ginkgo generates economics from programs in two primary ways. First, customers pay upfront fees to cover initial R&D costs for a program. Second, Ginkgo shares in the downstream value (typically in the form of a royalty stream or equity share) generated by programs.

68.    The Deficient Proxy illustration identified in the preceding paragraph was materially false and misleading when made because: (a) customers did not "first" pay "upfront fees," — instead Ginkgo or Ginkgo's investors "first" provided the funds that Linked Company customers recycled back to Ginkgo; and (b) the fees were not "highly predictable" and did not provide a "predictable revenue stream" but instead customers like Motif had raised concerns to Defendant Kelly about the "unpredictable way Ginkgo was expending the foundry credits" and Synlogic's CEO characterized Ginkgo's accounting of services as "loosey-goosey."

69.    The Deficient Proxy contained additional statements mischaracterizing Ginkgo's foundry revenue stream:

> We estimate that the unit costs of our Foundry cell engineering services are several times less expensive on average than the status quo (a customer doing equivalent R&D in-house, by-hand) and we expect that cost advantage to grow over time. We typically earn revenue tied to the units of work that we perform on behalf of our customers' programs. Initially, as we were building and validating the platform, these revenue [sic] covered less than 20% of the costs incurred to execute a program as the platform was less efficient than the status quo. As our platform has matured and efficiency improved, we have steadily increased the portion of program R&D costs that are covered upfront by customers and we now expect that new programs are structured to fully cover our direct costs, which will eventually enable us to earn a modest margin.  Our Foundry revenue provides a strong foundation of predictable revenue that is independent of any commercialization efforts by our partners.

70.    The statements identified in Paragraphs 62–69 above were materially false and misleading when made because the foundry revenue was:  (a) largely funded by circular payments originating from Ginkgo itself and/or Ginkgo's major investors, and was not "a strong foundation…independent of any commercialization efforts by our partners"; (b) was not predictable revenue for the reasons identified in Paragraph 68 above; and (c) Ginkgo's foundry programs were not structured to cover costs but rather to create phantom revenue out of Ginkgo's or its investors' money.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    22

71.     With respect to Synlogic, the Deficient Proxy reported Ginkgo's deferred revenue liability to Synlogic as only $72 thousand, and stated the following:

> In June 2019, the Company entered into several agreements with Synlogic, a publicly traded clinical-stage biopharmaceutical company focused on advancing drug discovery and development for synthetic biology-derived medicines. The Company entered into a Subscription Agreement with Synlogic whereby it purchased 6,340,771 shares of common stock at $9.00 per share for a total purchase price of $57.1 million, which represented a 19.9% equity interest in Synlogic. The Company also entered into a Warrant Agreement whereby it received the right to purchase 2,548,117 shares of common stock of Synlogic at an exercise price of $9.00 per share. The Company made a non-refundable prepayment related to the exercise price of the warrant equal to $8.99 per share for a total payment of $22.9 million. The warrant is only exercisable to the extent the Company's interest in Synlogic does not exceed 19.99%. The Company also entered into a Foundry Services Agreement ("Synlogic FSA") whereby Synlogic provided $30.0 million in cash as a non-refundable prepayment for Foundry services. The prepaid Foundry services can be utilized for development of collaboration strains. Services performed under the services agreement will be applied to the prepaid amount based on the contractual rates included in the contract, based on costs incurred plus a fixed margin. Work will be performed under the Synlogic FSA pursuant to TDPs. Each TDP will pursue the development of a specific collaboration strain and/or production protocol. The Synlogic FSA will terminate upon the earlier of the exhaustion of the prepayment amount in full or the fifth anniversary of the effective date of the agreement and may be extended in certain circumstances.

72.     The statements identified in Paragraph 71 above were materially false and misleading when made because they omitted that: (a) the $30 million that Synlogic purportedly "provided . . . in cash as a non-refundable prepayment for Foundry services" was in fact simply the recycling of an overpayment that Ginkgo provided as noted above; (b) that Ginkgo still owed Synlogic approximately $13.6 million in unfulfilled prepaid services, not $72 thousand; and (c) that the organisms Ginkgo helped engineer were not successful and failed to meet specified criteria, leading Synlogic to hire Ginkgo competitor Zymergen even though Ginkgo still owed Synlogic approximately $13.6 million in prepaid services.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    23

73. When describing revenue from Ginkgo's Linked Companies, the Deficient Proxy claimed that Synlogic accounted for only $73 thousand of related-party revenue in 2020 and only $17 thousand of related-party revenue in 2019. These statements were materially false and misleading when made because Synlogic indicated that it actually expended $16.4 million in prepaid services with Ginkgo in 2019 and 2020, all of which were pursuant to Linked Company transactions.

74. With respect to Linked Company Allonnia, the Deficient Proxy claimed that Ginkgo does not control Allonnia, and Ginkgo "is not the primary beneficiary of Allonnia as it does not control the decisions that most significantly impact Allonnia's economic performance," including "development activities." The Deficient Proxy also stated that Ginkgo entered into a Technical Development Agreement with Allonnia "under which we provide R&D services in return for cash consideration on a cost-plus fixed margin basis," and said that Allonnia generated revenue for Ginkgo of $4.96 million in 2021 and almost $2.3 million in the first quarter of 2021 alone — a $9 million annual run rate.

75. The statements identified in Paragraphs 73—74 above were materially false and misleading when made because: (a) Ginkgo did exercise substantial control over Allonnia; (b) they left out that Allonnia's managers included Ginkgo executives Kelly and Kakoyiannis, and that Allonnia listed its mailing address as "c/o Ginkgo Bioworks" in regulatory filings; and (c) Allonnia only employed a few people, inconsistent with the several million dollars of services that Ginkgo claimed that Allonnia generated.

76. With respect to Linked Company Kalo, the Deficient Proxy claimed that the "relationship with Kalo is a vendor-customer relationship" and that Kalo had generated a $11.9 million deferred revenue balance with Ginkgo by March 31, 2021.

77. These statements were materially false and/or misleading when made because: (a) Kalo is a Linked Company reliant upon and dominated by Ginkgo, who

had three Ginkgo executives listed as Kalo's "managers" and because Kalo worked out of Ginkgo's 27 Drydock building; and (b) the asserted $11.9 million deferred revenue balance is inconsistent with Kalo's formation 16 days earlier, with no employees at the time.

### E.   False and/or Misleading Foundry Business Statements

78.   Regarding foundry fees, the Deficient Proxy stated: "we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services." This statement was materially false and misleading when made because: (a) Ginkgo did not charge usage fees in "much the same way" as cloud computing companies or CROs; (b) unlike third-party cloud computing companies or CROs, Ginkgo exploited Linked Company relationships to extract large prepayments and excessive fees not traditionally charged by cloud computing companies or CROs; and (c) the statements left out that the "usage fees" that Ginkgo charged were paid from Linked Companies often using funds provided from Ginkgo and/or its largest investors.

79.   The Deficient Proxy stated that "The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023." This statement was materially false and misleading when made because Ginkgo provided a limited tool addressing one aspect of biotech "labor and tools": the commodity manipulation of yeast strains, and in particular of *Pichia pastoris*. Thus, Ginkgo had no basis to claim to address the entirety of the biotech labor or tools market.

### F.   False and Misleading Transparent Operations Statements

80.   With respect to transparency of operations, the Deficient Proxy stated: "Our culture is built on care, transparency, diversity, employee ownership and engagement, and a deep, humble respect for biology. Transparency is essential to how

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    25

we operate, to enable sharing of the insights and tools that enable our platform to grow, as well as to build trust and accountability with all of our stakeholders." This statement was materially false and misleading when made because Ginkgo was not transparent with investors about its Linked Company transactions, its circular accounting, the value provided to Linked Company clients, or Motif's patent infringement.

81. Further, the Deficient Proxy also omitted material information it was required to include under Items 303 and 503 of SEC Regulation S-K.[21]

82. Item 303 requires disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's financial condition. SEC Regulation S-K required Defendants to describe, in the Registration Statement as well as all SEC filings and investor communications during the Class Period, "material cash requirements from known contractual and other obligations. Such disclosures must specify the type of obligation and the relevant time period for the related cash requirement."[22] Similarly, Item 303 requires the disclosure of: "any known trends or any known demands, commitments, events, or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and…the extent to which income was so affected"; and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations."[23]

---

[21] 17 C.F.R. §§229.303, 229.503.

[22] 17 C.F.R. §229.303(b)(1).

[23] SEC Release Nos. 33-8056; 34-45321; FR-61.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    26

83. The SEC has stressed that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."[24]

84. By omitting to disclose their unfulfilled contractual obligations to Synlogic, the actual nature of related-party transactions as alleged herein, and their failures in the programs they operated for several Linked Companies, Defendants violated affirmative disclosure obligations under Item 303 of Regulation S-K.

85. Significantly, Item 503 requires disclosure of "the most significant factors that make the offering speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk." By failing to describe the risk to Ginkgo's operations if Ginkgo and its investor ceased overstating revenue using circular flows from investments in Linked Companies, and by failing to acknowledge at all the risks attendant from the patent infringement used to generate Hemami for Motif, among other misstatements, Defendants violated affirmative disclosure obligations under Item 503 of Regulation S-K.

**G.   False and Misleading Cronos Statements**

86. With respect to Cronos, the Deficient Proxy stated that Ginkgo was "supporting Cronos in their effort to biosynthesize cannabinoids," and discussed various details of the program but omitted the most impactful information: that Cronos considered the license it acquired from Ginkgo to be impaired, indicating that the program was not progressing as planned. As a result of this omission, the statements were materially misleading when made.

///

---

[24] S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                              27

### H.    Defendant Kelly Issued and Caused Ginkgo to Issue Other Materially False and/or Misleading SEC Filings

87.    Defendant Kelly issued false and/or materially misleading statements through the Forms 425 filed on May 11, 2021, August 19, 2021, August 20, 2021, and August 23, 2021.    Kelly possessed the power and authority to control the contents of Ginkgo's Form 425 and other SEC filings, press releases, and other public communications to investors and shareholders.    He issues or had access to copies of Ginkgo's SEC filings and press releases before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected to not be misleading.  He failed to do so.

88.    **May 11, 2021, Form 425 Conference Call Transcript**.  Defendant Kelly caused Ginkgo to make materially false and/or misleading statements in its May 11, 2021 Form 425 filing by suggesting and/or implying that Ginkgo's foundry work for Motif would create Motif's own Impossible Burger (already patented by Impossible Foods).  "They [Motif] want to pursue a whole range of different animal proteins that otherwise wouldn't be available in plants and then make those available to food developers so that we can have more Impossible Burgers.  So, they came to us with that spec. Get me a yeast that produces animal proteins."

89.    The statements identified in Paragraph 88 were materially false and misleading when made because it was Impossible Foods, not Ginkgo or Motif, that invented the process of synthesizing heme proteins using yeast, and Ginkgo/Motif simply stole its patented invention.

90.    **May 26, 2021, Form 425 Conference Call Transcript**.  Ginkgo's Head of Corporate Development, Anna Marie Wagner, spoke at a UBS Healthcare conference and made materially false and/or misleading statements in the May 26, 2021 Form 425 filing by misrepresenting Ginkgo's research on behalf of Motif and Kalo. Wagner stated: "But for these more mass applications, you need really efficient production strains.  And so, we've developed a really great host for producing proteins on behalf of Motif which

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    28

is doing food ingredients and now we have a new company that's launching on the platform, Kalo, which is making personal care proteins. They'll be able to leverage that strain which shaves a lot of time off the development cycle because we're not starting from scratch the way that Kalo would have had to start from scratch if they were just launching on their own, which is really the status quo. That's how most companies are getting started these days."

91.     The statements identified in Paragraph 90 were materially false and/or misleading when made because Ginkgo had not "developed a really great host for producing proteins on behalf of Motif," and instead had utilized an invention already patented by Impossible Foods, (b) the Codebase was not a "powerful asset[]", as it failed to produce a protein that Motif could reliably use without infringing on Impossible Foods' patent, and (c) they failed to disclose that Kalo and Motif were created by Ginkgo to serve as Ginkgo's customers, rather than being new companies that sought Ginkgo's business.

92.     **August 18, 2021, Form 425 Half Year Update Transcript**. Defendant Kelly caused Ginkgo to make materially false and/or misleading statements in its August 18, 2021 Form 425 filing by hyping Motif's use of Ginkgo's platform as if it was a completely unrelated company enthralled with Ginkgo's services. "So, what's exciting about Motif is this is a brand new company back in 2018 when it got started. And so, they built themselves from day one on top of Ginkgo's platform. In other words, it's not like Biogen where I'm convincing them to migrate some work they're doing at their own lab to Ginkgo. Motif was able to never spend a dime building out biotechnology lab equipment . . ."

93.     The statements identified in Paragraph 92 above were materially false and/or misleading when made because: (a) Motif actually built themselves upon Impossible Foods' patented invention, and Ginkgo facilitated that process; (b) the statements omitted that Motif had infringed upon Impossible Foods' patented invention;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    29

and (c) they failed to disclose that Motif was created by Ginkgo to serve as Ginkgo's customer, rather than being an independent company that chose to "buil[d] themselves from day one on Ginkgo's platform."

94. **August 23, 2021, Form 425 Press Release about Cronos**. The press release and Form 425 boasted that the collaboration achieved a productivity target, and quoted Defendant Kelly as stating: "Cell programming can enable access to rare and important molecules found in nature, such as cannabinoids."

95. The statements identified in Paragraph 94 above were materially misleading when made because they omitted that Cronos' license to utilize the referenced cell programming and resulting synthetic cannabinoid was impaired at the time, as would be subsequently disclosed by Cronos (not by Ginkgo).

96. **September 9, 2021 Form 425 Healthcare conference transcript.** Ginkgo, by and through its Head of Corporate Development, Anna Marie Wagner, spoke at a Healthcare conference and made materially false and/or misleading statements in the September 9, 2021 Form 425 filing by misstating Ginkgo's relationship with Motif. "The fastest growth sectors of the food industry today are people like Impossible Foods, right, or Motif, which is a company that launched on Ginkgo's platform that just raised a massive Series B. So, these are companies that are fundamentally disrupting their industries with very high value products."

97. The statements identified in Paragraph 96 were materially false and/or misleading when made for the same reasons as identified in Paragraph 93 and because they failed to disclose that Motif was not disrupting its industry but had simply stolen the invention of the original industry disruptor, Impossible Foods.

98. **September 10, 2021 Form 425 Wells Fargo Healthcare conference transcript**. Ginkgo, by and through its Head of Corporate Development, Anna Marie Wagner, spoke at a Wells Fargo Healthcare conference and made materially false and/or misleading statements in the September 10, 2021 Form 425 filing by misrepresenting

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT 30

Ginkgo's revenue receipts. "Because remember, the customer is actually paying for the R&D work. And so, the customer is going to choose to pay Ginkgo $5 million or $10 million to do an R&D project for them. They'd better be pretty darn sure that that product is going to pay off. So, there's an underwriting that happens there by the customer. It's not that Ginkgo is deciding to spend $10 million on a product. We're choosing to utilize our capacity for that revenue stream, but we're getting paid. Our investment is getting de-risked, and so we just want to make sure we're getting the appropriate share of every program that's running through the platform and that we're getting appropriately compensated for the value that we're driving."

99.     The statements identified in Paragraph 98 above were materially false and/or misleading when made because they failed to disclose that Ginkgo and/or Ginkgo's main investors, rather than the customer, "actually pay[]" for the R&D work via (a) a circular funding arrangement; (b) by offering customers multimillion dollar R&D credits, Ginkgo is in effect "deciding to spend $10 million on a product"; and (c) because its customers were overwhelmingly Linked Companies, Ginkgo's investments were not "de-risked."

I.     **Shareholders Approve the Ill-Informed and Ill-Advised Merger through the Deficient Proxy**

100.     The Deficient Proxy, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's shareholders to follow Defendants' exclusive recommendation to vote for the approval of all proposals necessary to consummate the ill-advised merger of Ginkgo and the Soaring Eagle SPAC. Ginkgo's September 14, 2021 press release labeled the transaction "the largest-ever biotechnology go-public transaction."

101.     More than half of SRNG shareholders opted to retain shares in the merged Company rather than redeem them for $10/share, as they were entitled to do. As a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                31

result, $858 million remained in the trust fund at closing. Combined with Private Investment in Public Equity ("PIPE") financing, the trust fund amount allowed the minimum cash contingency to be satisfied, thus allowing the transaction to close.[25]

**J.    Defendants' False and/or Misleading Statements are Exposed to Public Scrutiny by Third Party Reports**

102. On August 24, 2021, the MIT Technology Review ("MIT Review") published an article that raised questions regarding some of the claims asserted in the Deficient Proxy, quoting a venture capitalist as opining that the $15 billion deal valuation "'seems insane.'"[26]

103. The MIT Review noted that "Ginkgo frequently issues press releases announcing new customers, suggesting a growing clamor for its scientific resources. However, many of its customers are not fully independent from Ginkgo. According to Ginkgo's financial documents, more than half its foundry's 2020 revenues came from a few "related" companies that it partly owns."[27]

104. For example, the MIT Review analyzed Ginkgo's transactions with Synlogic and concluded "[i]n effect, the money took a round trip, starting as cash in Ginkgo's bank account and ending up as payment for foundry services." Further, the MIT Review noted that "this summer Synlogic announced it would begin human tests of a new version of its *E. coli* engineered by enEvolv, a startup recently purchased by Zymergen, which [Synlogic's CEO, Brennan] says brought capabilities to the project

---

[25] *See* Clayton, Nicholas A., "Soaring Eagle Acquisition Corp. (SRNG) Shareholders Approve Ginkgo Bioworks Deal," SPAC INSIDER, Sept. 14, 2021, available at https://spacinsider.com/2021/09/14/soaring-eagle-shareholders-approve-ginko-bioworks-deal/.

[26] *See* Regalado, Antonio, "Is Ginkgo's synthetic-biology story worth $15 billion?" MIT TECHNOLOGY REVIEW, Aug. 24, 2021, available at https://www.technologyreview.com/2021/08/24/1032308/is-ginkgos-synthetic-biology-story-worth-15-billion/.

[27] *Id*.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    32

that Ginkgo did not have at the time."[28]

105.  After noting that a "person formerly close to Genomatica described Ginkgo as acting as 'an arm of Viking [a major Ginkgo investor]' whose true business could be described as financial engineering, not genetic engineering," the MIT Review explained: "Ginkgo's practice of juicing up demand by investing in its customers, trading foundry work for equity, and financing demonstration projects was the subject of a 2020 Harvard Business School case study, which concluded that the arrangements were useful for 'explaining Ginkgo's future growth and untapped potential' to its own investors.  **But the arrangements make Ginkgo's finances a little harder to figure out, even for Ginkgo**."[29]

106.  On October 6, 2021, market researcher/short seller Scorpion Capital released a 175-page report on Ginkgo (the "Scorpion Report"), scathingly entitled "A Snake Oil Salesman And Some Hedge Funds Partner Up To Pimp The Latest 'Synthetic Biology' Scam -- As Phantom Revenue, A Hocus-Pocus Business Model, Rampant Related-Party Games, And A Decade of Colossal Failure Get Shoveled Into Yet Another Garbage SPAC."[30]

107.  The Scorpion Report described the Company as a "shell game" whose revenue is highly dependent on related party transactions.[31] Scorpion opined that Ginkgo was "one of the most brazen frauds of the last 20 years." Simultaneously, Citron Research published an article corroborating the factual findings in Scorpion's Report, stating: "we've too checked with DNA former employees and we don't think Scorpion

---

[28] *Id*.

[29] *Id*., emphasis supplied.

[30]   https://scorpioncapital.s3.us-east-2.amazonaws.com/reports/DNA1.pdf   ("SC Report").

[31] *Id*. at 35.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    33

is missing anything there."[32]

108.   The Scorpion Report indicated that Scorpion had conducted an "intensive investigation into Ginkgo's business model and practices, with a particular focus on the related-party entities that drive the bulk of its revenue." As part of this investigation, Scorpion Capital said it "completed 21 research interviews, encompassing a broad sample of former employees and executives of Ginkgo, as well as individuals who are currently employed at its related-party 'customers.'"[33]

109.   **The What**. The Scorpion Report mentioned the following non-exhaustive findings regarding Ginkgo related party transactions:

a)   The majority of [Ginkgo's] foundry revenue, an absurd 72% in 2020, and essentially 100% of its deferred revenue are derived from related-party "customers" it created, funded, controls, or influences via its ownership position and board seats[;]

b)   We have uncovered a smoking gun that indicates that essentially ALL of its foundry revenue is derived from related parties, suggesting that Ginkgo has engaged in a brazen effort to misclassify and misreport related party revenue and deceive investors with phony accounting[;] and

c)   Based on interviews with its related-party "customers," we believe that at least half of Ginkgo's reported foundry revenue is phantom – that is, non-cash and pure accounting hocus-pocus. We spoke with one of its largest such customers, from whom Ginkgo reported $38MM and $30MM of deferred revenue in 2019 and 2020. A senior employee there stated unequivocally that they have never paid Ginkgo cash for foundry services and are merely using "free" R&D credits following investments by Ginkgo

---

[32]   *See* https://citronresearch.com/wp-content/uploads/2021/10/Ginkgo-Bioworks-Its-not-a-scam-its-a-scheme.pdf.

[33] SC Report at 3.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    34

and Viking.[34]

110. **The How**. Significantly, the Scorpion Report revealed that the size and the novelty of Ginkgo's related-party customers did not justify or correspond with the significant quantity of services that Ginkgo claimed to provide:

a) "The entities are generally small, failed projects that share the following features: 1) based inside Ginkgo's headquarters; 2) have vaporous, glossy, Instagram-like websites that appear to be operated by Ginkgo; 3) have too few employees on LinkedIn to drive the "revenue" that Ginkgo books from them, and in some cases appear to have no employees at all; 4) appear to be controlled and run by Ginkgo, as the entities typically lack finance, treasury, or HR employees, indicating they are neither designed to nor actually operate independently; and 5) appear to be further controlled via "G&A Services Agreements" that suggest Ginkgo runs them."[35]

b) Noting the size and nature of the $30 million Synlogic five-year R&D prepayment, the Scorpion Report noted that not a single non-related Ginkgo customer had prepaid for that many years of R&D and that "[i]n a legitimate vendor-customer transaction, no customer would ever pre-pay five years of R&D spend."[36]

111. **The When and Why**. The Scorpion Report explained how Ginkgo used the quick-cash infusion, obfuscated related-party transactions to create a fake reserve to suggest a steady revenue stream: "The haste with which related parties recycle proceeds back to Ginkgo is startling. In virtually every case, Ginkgo and its investors inject cash into the related party, followed by Ginkgo immediately booking large chunks of

---

[34] SC Report at 3 (emphasis in original).

[35] *Id*.

[36] *Id*. at 42.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                           35

revenue and deferred revenue. We believe this serves several purposes, beyond just conjuring revenue from thin air: it creates a deferred revenue slush fund that enables Ginkgo to create quarterly accounting revenue at will, versus being dependent on the entity's R&D spend; it gets Ginkgo's hands back on its cash instantly, lest the related party ever have second thoughts about using Ginkgo's foundry services (a recurring source of tension with some related parties, which we discuss later); and it enables Ginkgo to create a false investor narrative around a deferred revenue backlog."[37]

112.   In surmising that Ginkgo's actual related-party foundry revenue is closer to 100% rather than the still-significant 60% to 70% reported in the Deficient Proxy, the Scorpion Report cited to the discrepancies in the documents filed by Synlogic and Ginkgo with the SEC for 2020.[38] For example, Synlogic's SEC filings reported that it expended $13.6 million of pre-paid Ginkgo credits in 2020, whereas Ginkgo's Deficient Proxy only classified $73 thousand of revenue in 2020, and $72 thousand of deferred revenue as of December 31, 2020, as "related party" from Synlogic.  This discrepancy boosts Ginkgo's related-party revenue percentage for 2020 from 72% (as reported in the Deficient Proxy) to 95%.

113.   **Extent of Interrelatedness of Ginkgo and its "Customers**." As noted above and as detailed in the Scorpion Report, Ginkgo and many of its customers, including Allonnia, Kalo, Joyn Bio, and Motif, shared a business office, some shared a phone number, and shared major investors Viking Global, Cascade and General Atlantic. Many Ginkgo employees rotated among the Linked Companies. For example, Dayal Saran, a program director at Ginkgo, became Head of R&D Alliance at Motif, Head of Synthetic Biology at Synlogic, and Vice President of Research at Allonnia.[39]

114.   Regarding related party Kalo, n/k/a Arcaea, the Scorpion Report disclosed

---

[37] *Id*. (emphasis in original).

[38] *Id*. at 51-2.

[39] *Id*. at 10, 131.

that Kalo's filings with the Massachusetts Division of Corporations confirm: (a) that it was formed on March 15, 2021, only 16 days before it purportedly had a $11.9M deferred revenue balance with Ginkgo, according to the Deficient Proxy; (b) that Kalo's LinkedIn page said that it had no employees at the time; (c) that Ginkgo's office was listed as its "principal office" and Ginkgo itself was listed as its agent; and (d) that it listed three Ginkgo officers and employees, including Defendant Kelly, as Kalo's managers[40]:



115.    Each of the above listed Kalo "Managers" was employed by Ginkgo. As noted above, Jasmina Aganovic lists on her LinkedIn page that she was with Ginkgo until July 2021, and did not start working for Kalo (n/k/a Arcaea) until July 2021.

116.    Regarding related party Joyn Bio, Joyn Bio lists its address on regulatory filings with the Massachusetts Secretary of State as Ginkgo's 27 Drydock address, and lists Defendants Kelly and Shetty as managers. The Scorpion Report indicated that ex-employees of Ginkgo described the day-to-day operations of Joyn Bio as "more like a subsidiary of Ginkgo or captive team within the company." The Scorpion Report also disclosed that this control enabled Ginkgo to charge Joyn Bio much more than what comparable vendors charged for comparable services, quoting from an interview with

---

[40] *Id*. at 9.

a Joyn Bio employee who explained that, along with another employee, they: "looked at this setup where Ginkgo wasn't being very transparent about how they were charging and what they were charging us for and why everything was costing as much as it was." The employee elaborated that: "[f]rom what other people are telling me, [Ginkgo is] charging very high prices relative to what we could get from other vendors, and that we still have to play ball with them. . . . We have a vendor who charges us about $840 for a small fermentation vessel.  And Ginkgo charges us between $1400 and $1500 for the same sized fermentation" but "we still have to play ball."[41]

117.  Regarding related party Allonnia, Allonnia's filings with the Massachusetts Secretary of State, through its February 2022 annual report, listed its principal office as being in "c/o Ginkgo Bioworks" at Ginkgo's 27 Drydock corporate headquarters, and listed two of its managers as Defendant Kelly and Ginkgo's Head of Ventures, Jason Kakoyiannis. The Scorpion Report exposed that in marked contrast to the Deficient Proxy's assertion that Ginkgo "entered into a Technical Development Agreement with Allonnia under which we provide R&D services in return for cash consideration on a cost-plus fixed margin basis," Allonnia's financial statements suggest that it made little or no cash payments to Ginkgo. The Scorpion Report further explained that Ginkgo's claimed revenue from Allonnia of $4.96 million in 2020 and almost $2.3 million in the first quarter of 2021, on top of $38 million of deferred revenue, were highly improbable given that Allonnia had a mere 6 employees at the time, suggesting that the claimed revenue streams "are simply sham transactions."[42]

118.  Regarding related party Motif, Motif is located within Ginkgo's 27 Drydock Boston headquarters.  The Massachusetts Secretary of State lists Ginkgo's headquarters as the principal office of Motif, Defendant Shetty is listed as the corporate agent of Motif, and Defendant Kelly and Ginkgo Head of Ventures Jason Kakoyiannis

---

[41] *Id.* at 127.

[42] *Id.* at 63, 81, 115.

are listed as directors of Motif. The Scorpion Report cited a Motif executive as asserting that Ginkgo appointed a Ginkgo employee as Motif's Director of R&D. His role was to funnel "R&D spend" back to Ginkgo. The Scorpion Report pointed out that, as a result of the planted employee's divided loyalty and one-sided influence, Ginkgo was able to charge Motif significantly more, estimated at 50% more, for strain engineering than comparable vendors charged.[43]

119. Regarding related party Genomatica, the Scorpion Report stated that "Genomatica appears to have been equitized in 2016 and 2018 with a Series A and Series B Preferred financing, respectively. The timing is opaque given Ginkgo's lack of disclosure. Nonetheless, Ginkgo discloses a carrying value at cost of $55MM in Genomatica's preferred stock, which we suspect closed in 2018. By 2019, Ginkgo already booked $44MM of revenue and deferred revenue [from Genomatica]."[44]

120. After conducting its research and interviews, the Scorpion Report concluded that "at least half of Ginkgo's reported revenue is phantom – that is, non-cash and pure accounting hocus-pocus."[45] The Scorpion Report relied upon three so-called red flags for this conclusion: a) Ginkgo's "revenue recognition policy in the prospectus spans a preposterous four pages and is impossible to decipher[;]" b) Ginkgo's "losses and cash burn are so unusually high and margins are so shockingly negative[;]" and c) there are significant "discrepancies between cash flows and income[.]"[46]

121. Further, the Scorpion Report also disclosed that it was told by several partners and insiders that Ginkgo had no unique technical advantages over other contract research organizations ("CROs") that modified yeast strains. It cited a Joyn Bio

---

[43] *Id.* at 123.

[44] *Id.* at 46 (emphasis in original).

[45] *Id.* at 3 (emphasis in original).

[46] *Id.* at 56.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT 39

source as stating that "it would be hard for me to point to something they do that is totally different than anybody else in the industry."[47]

122.    Several months after the publishing of the Scorpion Report, on February 18, 2022, Cronos filed Form 10-Q with the SEC disclosing that its collaboration license with Ginkgo had become impaired during the Third Quarter of 2021, *i.e.*, at the exact time that Ginkgo announced in a press release/Form 425 that it had achieved productivity targets with Cronos in its partnership to produce eight cultured cannabinoids.

123.    Shortly thereafter, on March 9, 2022, Impossible Foods sued Motif alleging that the Hemami technology that Ginkgo touted as developing for Motif was infringing the patented Heme beef replica of Impossible Foods. According to the complaint, Motif infringed Impossible Foods' technology for imitating the taste of real meat. *Impossible Foods Inc. v. Motif Foodworks Inc.*, 22-cv-00311-CFC (D. Del.). The complaint quoted Defendant Kelly 's statement that Ginkgo would "brew the next 100 hemes so that we can see many more Impossible Burgers in the next few years."

124.    In November 2022, Judge Bryson denied Motif's motion to dismiss the case, finding that "Impossible Foods plausibly argued that Motif's 'Hemami' ingredient infringes its patents for imitation meat without animal protein, even though Motif says Hemami has a protein naturally found in cows."[48]

125.    On November 18, 2021, after the Scorpion Report came out, a putative class action complaint was filed in this district captioned *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, Case No. 4:21-cv-08943-KAW. On July 18, 2022, Plaintiff Bernstein filed a second amended complaint on behalf of the putative class. The complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5, Section 20(a) of the Exchange Act, Section 14(a) of the Securities Act of 1934 and Rule 14a-9, Section 11 of

---

[47] *Id*. at 27.

[48]    https://www.reuters.com/legal/litigation/impossible-foods-clears-hurdle-imitation-meat-patent-lawsuit-2022-11-14/.

the Securities Act of 1933, and Section 15 of the Securities Act of 1933.

126. On July 21, 2022, the Ginkgo Defendants filed a motion to dismiss the second amended complaint in its entirety. After full briefing, on March 10, 2023, Judge Westmore denied the motion to dismiss with respect to the Section 10(b) claim, Section 20(a) claim, and Section 14(a) claim. With respect to the Section 11 claim's registration requirement, and the Section 15 secondary liability claim, Judge Westmore granted the motion to dismiss with leave to amend, specifying that the "Court finds that the assertions made in the opposition would satisfy the registration requirement."[49]

127. The failure of the Ginkgo defendants' motion to dismiss in the *Bernstein* case raises the probability of significant Company liability in that class action lawsuit.

128. The foregoing materially false and/or misleading statements in the Deficient Proxy, related Form 425 filings with the SEC, and other statements by the Defendants (collectively "Deficient Statements") harmed Ginkgo by diminishing its professional reputation for reliability and trustworthiness, limiting its opportunity to raise future funds, by hampering the shareholders' informed voting on the proposed Ginkgo-Soaring Eagle merger, and by exposing it to significant liability in the securities class action lawsuit. As a result of the false and/or misleading statements in the Deficient Proxy, Soaring Eagle, now Ginkgo, shareholders voted to approve the merger at an inflated and unsupportable valuation.

129. The Deficient Statements conveyed that the Company's revenue streams were due to its own biotech expertise and were robust, independent, and reliable. In reality, Ginkgo's revenue streams relied, in part, on patent-infringing technology and were dependent on related-party and self-financing and were unreliable.

/ / /

/ / /

---

[49] Case 4:21-cv-08943-KAW, ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT, Dkt. No. 81, filed 03/10/23.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    41

## VI.   THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.   General Duties as Directors and Officers

130.   The Individual Defendants breached their fiduciary duties, concealed material information concerning significant Linked Company transactions and their effects on the Company's business and reputation, and favored their own financial interests above those of the shareholders and the Company.

131.   According to the Company's 2022 Proxy: "The purpose of the Audit Committee is to prepare the Audit Committee report required by the SEC to be included in Ginkgo's proxy statement and to assist the Board in overseeing and monitoring: (1) the quality and integrity of the financial statements; (2) compliance with legal and regulatory requirements; (3) Ginkgo's independent registered public accounting firm's qualifications and independence; (4) the performance of Ginkgo's internal audit function; and (5) the performance of Ginkgo's independent registered public accounting firm."  Defendants Henry, Sankar and Sloan were and are members of Ginkgo's Audit Committee during the relevant time period and owed fiduciary duties to the shareholders to truthfully and not misleadingly perform these functions.

132.   Further, by reason of their positions as Ginkgo's officers and directors and because of their ability to control Ginkgo's business and corporate affairs, the Individual Defendants owed Ginkgo and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage Ginkgo in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Ginkgo and its shareholders to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

133.   Each director and officer owes to Ginkgo and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of loyalty and fair dealing, in the administration of Ginkgo's affairs and in the use and

preservation of its property and assets.

134. The Individual Defendants, because of their positions of control and authority as Ginkgo's directors and officers, were able to and did directly and/or indirectly, exercise control over the misconduct complained of herein.

135. To discharge their duties as Ginkgo's officers and directors, the Individual Defendants were required to exercise reasonable and prudent supervision over Ginkgo's management, policies, practices, and controls of the affairs of the Company. Accordingly, the Individual Defendants were required to:

a) Manage, conduct, supervise, and direct the employees, businesses, and affairs of Ginkgo in accordance with laws, rules, and regulations, as well as the charter and by-laws of Ginkgo;

b) Ensure that Ginkgo did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c) Remain informed as to how Ginkgo was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls, particularly with respect to SEC filing and reporting obligations;

d) Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Ginkgo and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e) Preserve and enhance Ginkgo's reputation as befits the "largest-ever biotechnology go-public transaction" company;

f) Exercise good faith to ensure that the affairs of the Company were

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    43

conducted in an efficient, business-like manner to make it possible to provide the most ethical and transparent disclosures of its business; and

g)    Refrain from unduly benefiting themselves and other Ginkgo insiders at the expense of the Company.

136.    As senior executive officers and directors of a publicly-traded company whose common stock was offered for registration, and was subsequently registered, with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, business, products, management, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the merger price and the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

**B.    The Duty of Reasonable and Prudent Supervision**

137.    The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants are required to, among other things:

a)    refrain from false or misleading disclosures of material corporate information to benefit themselves;

b)    ensure that Ginkgo complies with its legal obligations and requirements, including timely dissemination of truthful and accurate statements to shareholders and the investing public;

c)    conduct the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the

value of the Company's stock;

d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, including the nature and source of revenue streams, and compliance with the law;

e)      remain informed as to how Ginkgo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and timely make such disclosures as necessary to comply with applicable laws; and

f)      ensure that Ginkgo was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VII.      BREACHES OF FIDUCIARY DUTIES

138.   Each Individual Defendant owed to Ginkgo and to its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in managing and overseeing Ginkgo's affairs, as well as in the use and preservation of its property and assets.  The Individual Defendants' misconduct involves a knowing and culpable violation of their obligations as directors and officers of Ginkgo, the absence of good faith on their part, or a reckless disregard of their duties that they were aware or should have been aware posed a risk of serious injury to Ginkgo.  Each Individual Defendant ratified each other's misconduct because they collectively comprised Ginkgo's Board or its predecessor entity's board at all relevant times.

139.   The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose or correct the above-described false and/or misleading statements.

140.   In addition, the Individual Defendants breached their duties of loyalty and

good faith to the Company by prioritizing their own financial interests ahead of the Company's and its shareholders' interests.

141.   In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of a securities class action lawsuit that has proceeded beyond a motion to dismiss.  As a result, Ginkgo has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VIII.   CONTROL, ACCESS, AND AUTHORITY

142.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ginkgo.

143.   Because of their advisory, executive, managerial, and directorial positions with Ginkgo, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Ginkgo.

144.   Each of the Individual Defendants was the agent of each of the other Defendants and of Ginkgo, and was at all times acting within the course and scope of such agency.

## IX.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

145.   In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants further aided and abetted or assisted each other in breaching their respective duties.

146.   During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact and extent of the Linked Company transactions, the circular revenue streams, issues

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                46

with over-valued licenses and other misconduct noted above. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

147. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Ginkgo to conceal from Ginkgo's shareholders and the investing public the existence and extent of the material non-public information. Because the actions described herein occurred under the authority of the Defendants, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

148. The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to conceal from its shareholders the material vulnerabilities of Ginkgo's foundry platform as well as the related-company dependency of a large portion of Ginkgo's revenue stream, among other concealments.

149. Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his (or her) overall contribution to and furtherance of the wrongdoing.

## X.    DAMAGES TO GINKGO

150. The Individual Defendants' misconduct has caused extreme reputational damage to the Company. This is especially harmful to Ginkgo because the Company unequivocally states in the Deficient Proxy that "[t]ransparency is essential to how we operate." The Individual Defendants clearly breached this trust by acting in direct

contravention of the Company's public representations. This reputational harm has resulted in long-term damage to the Company.

151. The Linked Company transactions and other revenue related to the misleading statements, and the Individual Defendants' gross failures to timely address, remedy, or correct them, also severely damaged Ginkgo's reputation within the business community and in the capital markets. This is evidenced by, for example, the more than 24% loss in market capitalization[50] immediately after the Scorpion Report, corroborated by Citron Research, came out — pointing out the Individual Defendants' knowledge of or conscious disregard of the inflation of Ginkgo's $15 billion valuation.

152. Further, Ginkgo's non-related customers and current and potential investors expect the Company to comply with SEC regulations; and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information. Ginkgo's ability to attract customers and investors is now impaired.

153. Further, as a direct and proximate result of Defendants' actions, Ginkgo has expended and will continue to expend significant additional money, including: (a) costs incurred in defending against, and the potential settlement of, the securities class action lawsuit brought against the Company related to the Ginkgo and Soaring Eagle SPAC merger and its inflated valuation; and (b) costs incurred from the substantial compensation and benefits paid to Defendants, who are responsible for the scheme.

## XI.      DERIVATIVE ALLEGATIONS

154. Plaintiff brings this action for the benefit of Ginkgo to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of federal and state laws.

---

[50]      https://markets.businessinsider.com/news/stocks/ginkgo-bioworks-stock-price-scorpion-capital-short-seller-report-frankenstein-2021-10.

155. Ginkgo is named solely as a nominal defendant. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156. Plaintiff is and has continually been a Ginkgo shareholder during the entire period of wrongdoing alleged herein. Plaintiff therefore will adequately and fairly represent the interests of Ginkgo in enforcing and prosecuting its rights.

157. Ginkgo's Board at the time this action was initiated consisted of the following nine directors: Kelly, Shetty, Dekkers, Henry, Sankar, Sloan, Belldegrun, Kewalramani, and Hannan. Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act. Where, as here, a board is comprised of an odd number of directors, Plaintiff must allege that demand is futile as to a majority of the Board. Thus, in this case, Plaintiff must allege demand futility as to five out of the nine current directors.

**A.    Demand Is Excused Because the Individual Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment**

158. Plaintiff did not make a demand on the Board prior to instituting this action because any demand would have been a wasteful and futile act, and therefore demand is futile. The wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of Defendants' fiduciary duties. Those acts, which are detailed above, include, *inter alia*: (a) failure to fully, fairly, properly and timely disclose the relevant facts necessary for Ginkgo's stockholders, and Soaring Eagle SPAC's stockholders, to cast an informed vote regarding the desirability of Ginkgo's merger with the Soaring Eagle SPAC; (b) failure to fully, fairly, properly and timely disclose the identities of related-party companies and the nature and extent of those interconnected relationships; (c) maintaining woefully inadequate internal controls over the Company's disclosures and notification procedures, corporate governance, and risk monitoring, causing Ginkgo to make the above false and misleading statements; and (d)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    49

causing Ginkgo to file materially false and misleading SEC filings and/or directly making materially false and misleading statements regarding the Company's proxy solicitation and related registration statement.

159. These acts, and the other improper acts set forth in this complaint demonstrating a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment.

160. All Director Defendants (Kelly, Shetty, Dekkers, Henry, Sankar, Sloan, Belldegrun, and Kewalramani), who constitute eight out of the nine current members of the Board,[51] directly and materially participated in the wrongs complained of above, including, *inter alia*, the making, signing and/or sanctioning of the false and misleading statements filed with the SEC.

161. Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal and state laws, including knowingly and consciously presiding over the Company's systematic deficiencies and unsound risk management and information disclosure practices, as well as concealing the true extent of Ginkgo's related party transactions. Among other things, Director Defendants Kelly, Shetty, Dekkers, Henry, Sankar, Sloan, Belldegrun, and Kewalramani made, or caused Ginkgo to make, materially false or misleading statements, including in the Deficient Proxy.

162. Defendant Harry E. Sloan was a director of Soaring Eagle Acquisition Corp., and signed the Proxy Statement himself and also signed the Proxy as the attorney-in-fact for other individuals who are named defendants in the securities fraud class action, *i.e.* Eli Baker, Scott M. Delman, Joshua Kazam, Isaac Lee, Timothy Leiweke, Dennis A. Miller, and Laurence E. Paul. Defendants Jason Kelly, Reshma Shetty, Arie Belldegrun, Marijn Dekkers, Christian Henry, Reshma Kewalramani, and Shyam Sankar each gave consent to be listed in the Proxy Statement as a director of the merged Company, and became a director after the merger was completed. Defendant

---

[51] Director Hannan is not sued herein.

Belldegrun also specifically participated in the May 7, 2021 SRNG Board meeting wherein the merger with Ginkgo was approved.

163. Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicates they knowingly adopted, endorsed, or condoned a business strategy that incorporated the systematic obfuscation of the extensive related party transactions and accompanying underreporting of the percentage of related party revenues which cannot be considered a legitimate exercise of business judgment. Demand is therefore excused.

**B.    Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the False and Misleading Statements**

164. Demand is also excused because all the Director Defendants, who comprise eight out of the nine current members of the Board, face a substantial likelihood of liability for the claims alleged against them in this complaint and in the related securities fraud class action complaint (*Bernstein v. Ginkgo Bioworks Holdings*, Case No. 21-cv-08943-KAW (N.D. Cal.). Eight of the nine current Directors (Kelly, Shetty, Dekkers, Henry, Sankar, Sloan, Belldegrun, and Kewalramani) are defendants in the related *Bernstein* securities fraud class action, where their motion to dismiss was denied by order dated March 10, 2023. They are therefore personally interested in the claims asserted herein and cannot consider a demand to bring suit against themselves. Demand is thus futile as to all such directors.

165. Indeed, the court in *Bernstein* has already held that the SEC Filings signed or approved by the Director Defendants are false. The Court's March 10, 2023 Order stated that "The fact that the Company's primary customers—such as Allonnia, Kalo, Joyn Bio, and Motif—operated out of Ginkgo's headquarters, that many listed Ginkgo's phone number as their own, and that Ginkgo used intertwined employees, managers, and directors to control these 'customers' would surely satisfy the falsity requirement given that Defendants disclosed that it lacked control over these entities." *See* March 10, 2023 Order

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    51

at p. 11 (Dkt. No. 81).  The Court also held that "most of Ginkgo's reported revenue was derived from related party entities, rather than external customers, at rates higher than reported in the Proxy Statement, which indicates that they were not legitimate vendor-customer transactions . . . The allegations of close links between these various entities flatly contradict Defendants' representations that the entities were independent." *Id.* at 11-12.

166. The Director Defendants (Kelly, Shetty, Dekkers, Henry, Sanskar, Kewalramani, Sloan and Belldegrun) were aware of the materially false and misleading statements of Ginkgo's Deficient Proxy but failed to correct them or disclose the true facts.  In particular, the Director Defendants had affirmative obligations to oversee Ginkgo's compliance with the SEC's rules and regulations.

167. The Court in the related *Bernstein* action has already held that adequate facts have been pled to show the Director Defendants' scienter.  Notably, the Court held that "'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts.' . . . As a result, most of the facts that lead to a strong inference of scienter are the same that show falsity. *See id*. Accepting as true that Ginkgo shared management, directors, and office space with Allonnia, Kalo, and Joyn Bio, scienter is easily inferred. Defendants' representations of the entities' independence despite their alleged interdependence suggests an intent to deceive. If that is true, the defendants must have known they were not reporting the truth—there is no middle ground between the two positions. The most cogent inference that can be drawn, therefore, is that the defendants acted with scienter."  *See* March 10, 2023 Order at 12.

168. In addition, the members of the Audit Committee (Henry, Sankar and Sloan) consciously ignored their obligations as provided in the Audit Committee Charter, in addition to their duties imposed by law.  Despite the lack of transparency in disclosing fundamental failings in the Company's internal controls, they did not cause Ginkgo to remediate those control deficiencies. The Audit Committee's deliberate failure of oversight constituted breaches of their fiduciary duties to Ginkgo and has

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    52

resulted in significant harm to the Company.

169. Further, the Audit Committee members were charged with ensuring the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, Soaring Eagle's stockholders, and the investing public, including disclosures regarding the Company's internal controls. By approving false and/or misleading SEC filings the Audit Committee members (Henry, Sankar and Sloan) breached their fiduciary duties of candor and loyalty. The Audit Committee was directly responsible for approving the Company's materially false and misleading SEC filings. The other Director Defendants were responsible for the false SEC filings because they signed the statements or are subject to liability under the federal securities laws for the false SEC filings because they were listed in the SEC filings as persons who would become directors of the Company upon consummation of the transaction.

170. The Company's Governance Guidelines stipulate that the responsibilities of the Directors encompass the following:

> The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees. Each director is expected to spend the time and effort necessary to properly discharge their responsibilities. These include:
>
> - exercising their business judgment in good faith;
>
> - acting in what they reasonably believe to be the best interest of the Company;
>
> - considering the interests of the Company's (a) stockholders and (b) other stakeholders, including the Company's workforce, customers, suppliers, academic researchers, governments and communities, in the case of this clause (b), as may be identified or revised by the Board from time to time;
>
> - engaging with management regarding the Company's key stakeholders, as identified or revised by the Board from time to time, and any initiatives or matters pertaining to key stakeholders;
>
> - becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                53

- ensuring that the business of the Company is conducted for the long-term value of the Company.[52]

171. The factual allegations above demonstrate that the Director Defendants violated these responsibilities by, among other things, not exercising their business judgment in good faith and not acting with a reasonable belief in what was in the best interests of the Company.

172. Accordingly, there is significant doubt that the Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of the federal securities laws.

173. The entire Board had the duty to ensure Ginkgo's systems were sufficiently well-designed to prevent false and misleading statements, including in SEC filings, regarding their business operations and revenue streams. The Board's duty was heightened by the fact that Ginkgo was engaging in a reverse merger with the Soaring Eagle SPAC.

174. The Board failed to fulfill that duty, and its failure is even more egregious in light of the many "red flag" warnings both before and during the Relevant Period that Ginkgo's internal controls were not sufficient to address the misconduct at issue in this complaint. Given the Board's awareness and deliberate concealment of the effect, extent and nature of the Linked Company revenue streams — it is clear the Board either deliberately or recklessly failed to correct Ginkgo's SEC filings, including the Deficient Proxy, to the detriment of the Company and its shareholders.

175. For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this complaint. Because a majority of the Board faces a substantial risk of personal liability, demand is futile.

---

[52] *See* Ginkgo's Corporate Governance Guidelines, available at https://s28.q4cdn.com/823357996/files/doc_governance/Ginkgo_Bioworks_Holdings_Inc_-_Corporate_Governance_Guidelines_docx.pdf, last visited Apr. 26, 2023.

176. Further, both Defendants Kelly and Shetty were founders, directors, and officers of the Company both pre- and post-merger[53] and had access to, knowledge of, and in the case of Defendant Kelly direct participation in, the false and misleading information regarding the Company detailed herein. Therefore, Defendants Kelly and Shetty face a substantial likelihood of liability for the claims in this complaint. Demand against Defendants Kelly and Shetty is excused on this ground.

177. Further, non-employee Directors Henry, Sankar and Dekkers were members of the Board of Directors of the Company both pre- and post-merger[54] and had access to, and knowledge of, the false and misleading information regarding Ginkgo herein. Therefore, Defendants Henry, Sankar and Dekkers face a substantial likelihood of liability for the claims in this complaint. Demand against Defendants Henry, Sankar and Dekkers is excused on this ground.

178. The Director Defendants' failures to meet their fiduciary obligations also allowed certain Ginkgo and Soaring Eagle insiders to reap unlawful profits from acquiring at minimal expense, and then retaining, selling or disposing of Ginkgo shares at artificially-inflated prices.

179. All the Director Defendants failed to exercise any responsible oversight over the making and filing of the misleading statements and failed to implement reasonable internal controls with respect to the same.  Accordingly, a clear majority of the Board (Kelly, Shetty, Dekkers, Henry, Sanskar, Kewalramani, Sloan and Belldegrun) is unable to consider a demand to investigate Plaintiff's allegations that Defendants breached their fiduciary duties and made, allowed, and failed to correct the misleading statements for their own personal gain. The Individual Defendants cannot investigate allegations of Defendants' wrongdoing in a disinterested and independent manner.

180. Considering the foregoing facts, the Individual Defendants face a

---

[53] Deficient Proxy at 338.

[54] *Id*. at 338-40.

substantial likelihood of liability in this case, thus rendering demand on them futile.

### C. Demand Is Excused Because Certain Director Defendants Received a Material Personal Benefit from the Alleged Misconduct

181. Both Defendants Kelly and Shetty received a material personal benefit from the misconduct detailed throughout the complaint in that they each received in 2021 total compensation of $380,742,276.[55] This represents over 36 times their 2020 total compensation from the Company of over $10.5 million each and the size of this increase is due to the merger benefits both reaped.

182. Further, post-merger, Defendants Shetty and Kelly control 49.3% of the Company.

183. The 2022 Proxy listed Shetty as owning 165,841,730 class B Common Stock shares of the Company, representing 32.9% of the total voting power of the Company.

184. Similarly, the 2022 Proxy listed Kelly as owning 82,431,106 class B Common Stock shares of the Company, representing 16.4% of the total voting power of the Company.

185. The Deficient Proxy[56] notes that Soaring Eagle's "Sponsor purchased 43,125,000 founder shares prior to SRNG's initial public offering for an aggregate purchase price of $25,000, or approximately $0.0006 per share, which accounted for approximately 20% of SRNG's outstanding shares after the consummation of its initial public offering. Upon the Closing, assuming no founder shares are forfeited pursuant to the terms of the Sponsor Support Agreement as a result of shareholder redemptions exceeding a specified threshold, such founder shares will be converted into 43,125,000 shares of New Ginkgo Class A common stock."

186. In other words, the founder shares that cost $25,000 would be turned into an asset, immediately after the merger, worth approximately $431,250,000.

---

[55] $250,000 salary + $380,479,776 stock awards + $12,500 other comp. 2022 Proxy at 37.

[56] Deficient Proxy at 126.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    56

187.   That sponsor was Eagle Equity Partners III, LLC ("EEP III"), a Delaware limited liability company, that was formed by Defendant Sloan, Eli Baker and Jeff Sangansky.  Defendant Sloan is a managing member of EEP III and therefore directly financially profited from turning EEP III's $25,000 investment in over $430 million worth of Company stock. Even at the most recent Company stock valuations hovering around $1.20 a share, EEP III's 43,125,000 shares are worth approximately $51,750,000.

188.   Considering the foregoing facts, the Director Defendants Shetty, Kelly and Sloan each received a substantial, material personal benefit from the alleged misconduct, thus rendering demand on them futile.

## XII.      CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Against All Individual Defendants)

189.   Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

190.   Each of the Defendants owed and owes fiduciary duties to Ginkgo and its stockholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe Ginkgo the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.  Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Ginkgo and its stockholders by failing to act to ensure Ginkgo maintained adequate internal controls to comply with the SEC filing requirements and other applicable laws.

191.   Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to Ginkgo to protect its rights and interests.  In breach of their fiduciary duties owed to Ginkgo, Defendants willfully participated in material omissions and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          57

misrepresentations related to the Company's merger with Soaring Eagle, failed to fully inform themselves prior to making decisions as directors and officers, and failed to correct the Company's public statements, including in the Deficient Proxy, rendering them personally liable to the Company for breaching their fiduciary duties.

192. Defendants had actual or constructive knowledge that Ginkgo had improperly misrepresented its related-party transactions and other weaknesses in its financials and they failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly.

193. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194. Additionally, Defendants have affirmative obligations under Corporate Governance Documents, including the charters of various Board committees and the Corporate Governance Guidelines, that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this complaint.

195. Defendants' actions detailed herein were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

196. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Ginkgo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Individual Defendants)**

197. Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                            58

198.   Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to Ginkgo.

199.   The Individual Defendants owed to Ginkgo certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Ginkgo.

200.   Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties owed to Ginkgo.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

201.   Ginkgo was injured as a direct and proximate result of the aforementioned acts.

**COUNT III**
**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Against All Individual Defendants)**

202.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

203.   SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    59

misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

204.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the Deficient Proxy.  The Deficient Proxy contained recommendations to the stockholders to approve all proposals related to the Ginkgo and Soaring Eagle merger, including proposals to vote to approve the merger, elect the recommended slate of the Board of Directors, and hold onto/convert (and not redeem at $10 a share) the shares of Soaring Eagle. The Deficient Proxy, however, misstated or failed to disclose the following information, among others:  (a) the deficiencies in Ginkgo's internal and disclosure controls that were known to the Board when the Deficient Proxy was filed; (b) the nature, effect and extent of Ginkgo's Linked Company transactions on, among other things, Ginkgo's foundry revenues and free cash flow; (c) the true and accurate valuation of the Ginkgo business; and (d) the fact that Ginkgo faced significant reputational and financial harm when the truth would inevitably come out.

205.    By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, Ginkgo misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Ginkgo's recommendations to vote in favor of the merger proposals in the Deficient Proxy.

206.    As a result of Defendants' violations of the proxy laws, Ginkgo has been damaged and harmed.

**COUNT IV**
**Unjust Enrichment**
**(Against All Individual Defendants)**

207.    Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

208.    During the Relevant Period, Defendants received fees, stock options, stock,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                   60

or similar compensation from Ginkgo and/or Soaring Eagle that was tied to the Company's going-public merger with Soaring Eagle, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of Ginkgo's corporate governance guidelines and code of ethics, and self-dealing.

209. Plaintiff, as a shareholder and representative of Ginkgo, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation — including any salary, options, performance-based compensation, and stock — obtained by the Individual Defendants due to their wrongful conduct alleged in this complaint.

### COUNT V
### Contribution and Indemnification
### (Against Defendants Sloan, Kelly and Dmytruk, and All Individual Defendants Who May Be Found Liable in the Related Securities Class Action)

210. Plaintiff incorporates by reference and re-alleges each of the foregoing allegations as though fully set forth in this paragraph.

211. This claim is brought derivatively on behalf of the Company against Defendants Sloan, Kelly and Dmytruk, and all Individual Defendants who may be found liable in the related securities class action for contribution and indemnification.

212. Ginkgo is named as a defendant in a putative shareholder class action filed in this District on November 18, 2021, with a second amended complaint filed on July 18, 2022, and titled *Bernstein v. Ginkgo Bioworks Holding, Inc.*, Case No. 4:21-cv-08943-KAW. *Bernstein* asserts claims under the federal securities laws for, *inter alia*, violations of Sections 11 and 15 of the 1933 Securities Act and Section 14(a) of the Securities Exchange Act of 1934, by making or causing to be issued false and/or misleading statements in the Proxy for and related to the merger between Ginkgo and Soaring Eagle. In the event the Company is found liable for violating the federal securities laws, its liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein. The Company is entitled to receive contribution from those Defendants in connection with the securities fraud

class action against the Company currently pending in this District.

213. Accordingly, Ginkgo is entitled to all appropriate contribution or indemnification from Defendants.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and Ginkgo and against all Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Ginkgo and that Plaintiff is an adequate representative of Ginkgo;

B.   Declaring that the Individual Defendants have breached their fiduciary duties to Ginkgo, and aided and abetted breaches of fiduciary duties;

C.   Declaring that the Individual Defendants violated California Corporations Code § 25403;

D.   Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder;

E.   Declaring that Ginkgo's reverse merger with Soaring Eagle SPAC harmed the shareholders of Ginkgo and harmed Ginkgo's corporate reputation and good will;

F.   Determining and awarding to Ginkgo the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with pre-judgment and post-judgment interest thereon;

G.   Directing Ginkgo and the Individual Defendants to take all necessary actions to reform and improve Ginkgo's corporate governance and internal procedures to comply with applicable laws and to protect Ginkgo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other actions as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of related party transactions and implement procedures for greater shareholder input into the policies

and guidelines of the Board, and to ensure proper corporate governance policies, including, among other things:

      (i)    a proposal to strengthen Board oversight and supervision of accounting for related-party revenue and pre-earned revenue;

      (ii)    a proposal to strengthen the Company's internal and disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public; and

      (iii)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater transparency to stockholders and more informed stockholder input into the policies and guidelines of the Board;

H.    Awarding Ginkgo restitution from the Individual Defendants and each of them, and ordering them to disgorge all inequitable profits, benefits, and other compensation, including the proceeds of overvaluation of the Ginkgo merger with Soaring Eagle;

I.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

J.    Granting such other and further relief as the Court deems just and proper.

## XIV.    **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 28, 2023

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)

*s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT       63

Facsimile: (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com

*Attorneys for Plaintiff Weining Hu*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    64

**VERIFICATION**

I, Weining Hu, M.D. Ph.D., verify that I am a shareholder of Ginkgo Bioworks Holdings, Inc.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 4/23/2023 | 11:56 AM PDT _____.


_____    Weining Hu, M.D., Ph.D.