UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEINING HU,<br><br>        Plaintiff,<br><br>v.<br><br>ELI BAKER, et al.,<br><br>        Defendants. | Case No. 4:23-cv-02077-KAW<br><br>**ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Re: Dkt. No. 69 |
| ERIC BOWERS, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>JASON KELLY, et al.,<br><br>       Defendants. | Case No. 4:23-cv-05396-KAW<br><br>Re: Dkt. No. 58 |

On May 27, 2025, Plaintiffs Weining Hu and Eric Bowers filed a motion for preliminary approval of a settlement agreement between the parties.[1]

Having considered the parties' filings and the arguments presented at the August 7, 2025 hearing, and for the reasons set forth below, the Court GRANTS Plaintiffs' motion for preliminary approval.

## I.   BACKGROUND

### A.   The Derivative Claims

Ginkgo Bioworks Holdings, Inc. ("Ginkgo" or "the Company") is an early-stage company

---

[1] Plaintiffs filed identical motions in both cases, so all references to docket entries in connection with this motion will be to the lower-numbered case, *Hu v. Baker,* 23-cv-2077-KAW. Other filed documents will be preceded by *Hu* or *Bowers*, respectively, and the docket number.

1  that claimed to have developed a platform for cell programming which would enable the
2  biological production of a diverse range of synthetic products. Ginkgo came to exist in its current
3  form when its predecessor, Soaring Eagle Acquisition Corp. ("Soaring Eagle"), a special purpose
4  acquisition corporation ("SPAC"), acquired a private company, Ginkgo Bioworks, Inc. ("Legacy
5  Ginkgo"), with Legacy Ginkgo becoming a subsidiary of the Company (the "Merger"). (Bowers
6  Compl., Dkt. No. 1 ¶¶ 2, 5-6.)

In the Derivative Actions, Plaintiffs asserted claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duty, the aiding and abetting thereof, and related stockholder causes of action under Delaware law against the Individual Defendants[2] – directors, officers, or controlling shareholders of Gingko and Soaring Eagle – in connection with, inter alia, the Individual Defendants' (i) alleged material misstatements and omissions about the Company's revenue and sources of revenue; and (ii) other alleged misconduct in connection with the Merger that formed Ginkgo. (*Hu* Compl., Dkt. No. 1 ¶¶ 47-99.)

Defendants Eagle Equity Partners III, LLC (the "Sponsor"), Sloan, Baker, Delman, Kazam, Lee, Miller, Paul, and Leiweke (collectively, the "Soaring Eagle Defendants") are former directors, officers, or controlling shareholders of Soaring Eagle. Plaintiffs alleged that the Soaring Eagle Defendants owed Soaring Eagle a fiduciary duty to place the Company's best interests ahead of their own. (Chancery Compl., *In re Ginkgo Bioworks Holdings, Inc., Stockholder Derivative Suit,* C.A. No. 2024-0361-KSJM (Del. Ch.) ¶¶ 11, 13, 109.)

According to Plaintiffs, the Soaring Eagle Defendants conducted one of the largest SPAC initial public offerings on February 26, 2021, when they took Soaring Eagle public, selling over 172 million units and raising over $1.7 billion (the "IPO"). (*Bowers* Compl. ¶ 5.) Prior to Soaring Eagle's IPO, the Sponsor paid $25,000 for 43.125 million Soaring Eagle "Founder Shares," roughly $0.0006 per share. (*Hu* Compl. ¶ 185.) The Founder Shares would only become freely tradable in the event Soaring Eagle entered into a "business combination" within 24 months of the

---

[2] The Individual Defendants are Eli Baker, Arie Belldegrun, Marijn Dekkers, Scott M. Delman, Mark Dmytruk, Christian Henry, Jason Kelly, Reshma Kewalramani, Isaac Lee, Timothy Leiweke, Dennis A. Miller, Laurence E. Paul, Shyam Sankar, Reshma Shetty, Harry E. Sloan, and Joshua Kazam. (*Hu* Compl. ¶¶ 29-44; *Bowers* Compl. ¶¶ 24-32.)

1   IPO. (*Bowers* Compl. ¶¶ 65-66.) In the business combination, the Founder Shares would convert
2   to Class A common stock on a one-for-one basis and become freely tradable after a short "lockup"
3   period. (Chancery Compl. ¶ 5.) At the time of the Merger, the Founder Shares were worth over
4   $431 million. (*Id.; Hu* Compl. ¶ 186.) If Soaring Eagle did not complete a transaction within 24
5   months, the Founder Shares would expire as worthless and Soaring Eagle would have to pay back
6   the IPO investors. (*Bowers* Compl. ¶ 66.) In other words, the Soaring Eagle Defendants could
7   only unlock the value associated with their Founder Shares — for which they paid a de minimis
8   amount — if a business combination occurred. (Chancery Compl. ¶ 6.) Plaintiffs alleged that the
9   Soaring Eagle directors' interests in the Sponsor, which owned the Founder Shares, created a
10  conflict of interest between them and the Company. *Id.*

11  Plaintiffs alleged that the Soaring Eagle Defendants agreed to the Merger that valued
12  Legacy Ginkgo at $15 billion, even though it brought in less than $80 million in revenue while
13  losing over $100 million. (Chancery Compl. ¶¶ 7, 177.) The valuation of Legacy Ginkgo was
14  largely based on the projections contained in the Proxy soliciting shareholder approval of the
15  Merger. (Chancery Compl. ¶ 15.) These projections claimed that Legacy Ginkgo would have
16  $345 million of unlevered free cash flow in 2021, which would then increase 20x to $7.6 billion
17  by 2025. *Id.* ¶¶ 15, 111. According to Plaintiffs, Defendants knew this was impossible. *Id.*

18  Plaintiffs further alleged that the companies that were utilizing Legacy Ginkgo's platform
19  were actually related parties that were often founded, funded, and staffed by Legacy Ginkgo, its
20  employees, or its key investors, and not "leading multinationals" as Defendants claimed. (*Bowers*
21  Compl. ¶¶ 73, 97.) These "OpCos" often operated out of Ginkgo's own headquarters. *Id.*
22  Defendants, however, held these OpCos out as independent companies despite their obvious
23  overlaps with Legacy Ginkgo. (*See, e.g., Hu* Compl. ¶¶ 69, 165.) According to Plaintiffs, 72% of
24  Legacy Ginkgo's 2020 revenue and 100% of its deferred revenue came from these related party
25  OpCos. (*Bowers* Compl. ¶ 78.)

26  Plaintiffs alleged that, to complete the Merger, Defendants issued a materially false and
27  misleading Proxy, and that the Proxy made misleading claims about Legacy Ginkgo's value and
28  the adequacy of Legacy Ginkgo's revenue streams and omitted that Legacy Ginkgo's revenues

3

were propped up by a slew of related-party transactions. (*Bowers* Compl. ¶¶ 9, 72, 80-97.) As a result of this misleading Proxy, Legacy Ginkgo's shareholders voted in favor of the Merger. (*Hu* Compl. ¶ 128.)

### B.  Procedural Background

#### i.  The Federal Derivative Actions

On April 28, 2023, Plaintiff Hu filed *Hu v. Baker, et al.*, No. 4:23-cv-02077-KAW, in the United States District Court for the Northern District of California derivatively on behalf of nominal defendant Ginkgo and against certain of the Individual Defendants alleging claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, violations of Section 14(a) of the Exchange Act, unjust enrichment, and contribution and indemnification (the "*Hu* Action").

On October 20, 2023, Plaintiff Bowers filed *Bowers v. Kelly, et al.*, No. 4:23-cv-05396-KAW, in the Northern District derivatively on behalf of nominal defendant Ginkgo and against certain of the Individual Defendants alleging claims for violations of Section 14(a) of the Exchange Act, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets (the "Bowers Action"). Prior to filing his complaint, Bowers made a litigation demand on the Company's Board to investigate and redress the wrongdoing alleged in the Derivative Actions (the "Litigation Demand").

On December 15, 2023, the Court entered a Stipulation and Order staying the *Bowers* Action pending events in the related Securities Action and subject to certain conditions. On January 29, 2024, the Court entered a similar Stipulation and Order in the *Hu* Action. On February 28, 2024, *Hu* moved to consolidate the *Hu* Action and the *Bowers* Action, which was ultimately denied on September 13, 2024. (*Hu,* Dkt. No. 54.)

On January 17, 2025, Defendants moved to dismiss. (*Hu,* Dkt. No. 61.) On February 20, 2025, the Court entered a Stipulation and Order suspending the deadlines in the Federal Derivative Actions to allow the parties to finalize the settlement of the Derivative Actions. (*Hu,* Dkt. No. 64.)

#### ii.  The Delaware Chancery Action

On April 14, 2023, Dylan Newman made a demand to inspect the Company's books and

1 records pursuant to 8 Del. C. § 220 in connection with the misconduct alleged in the Derivative
2 Actions (the "Newman 220 Demand"). (Decl. of Francis A. Bottini, Jr., "Bottini Decl.," Dkt. No.
3 69-1 ¶ 21.) Thereafter, pursuant to a confidentiality agreement, the Company produced over four
4 thousand pages of documents to Newman that were responsive to his demand (the "220
5 Documents"). *Id.* On April 4, 2024, utilizing the 220 Documents, Newman filed the *Newman*
6 Action derivatively on behalf of nominal defendant Ginkgo and against the Individual Defendants
7 alleging claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and
8 unjust enrichment. *Id.*

9     On July 6, 2023, Shlomo Moskowitz made a demand to inspect the Company's books and
10 records pursuant to 8 Del. C. § 220 in connection with the misconduct alleged in the Derivative
11 Actions (the "Moskowitz 220 Demand," and with the Newman 220 Demand, the "220
12 Demands"). (Bottini Decl. ¶ 22.) Thereafter, pursuant to a confidentiality agreement, the
13 Company produced 220 Documents to Moskowitz that were responsive to his demand. *Id.* On
14 April 17, 2024, utilizing the 220 Documents, Moskowitz filed the *Moskowitz* Action derivatively
15 on behalf of Ginkgo and against certain of the Individual Defendants alleging claims for breach of
16 fiduciary duty, contribution and indemnification, and aiding and abetting breach of fiduciary duty.
17 *Id.*

18     On September 10, 2024, the Delaware Chancery Court granted the parties' stipulation for
19 consolidation of the *Newman* and *Moskowitz* Actions, appointing co-lead counsel, and extending
20 the defendants' deadline to respond to the operative complaint. (Bottini Decl. ¶ 23.) On
21 November 22, 2024, Defendants moved to dismiss the operative complaint in the Delaware
22 Chancery Action and filed an opening brief in support of their motion. *Id.* On January 17, 2025,
23 plaintiffs in the Delaware Chancery Action filed a verified amended consolidated complaint. *Id.*

24     **C.**    **Mediation and Settlement**

25     The Settling Parties engaged in mediation over the course of several months. (*See* Bottini
26 Decl. ¶ 24.) On January 30, 2024, the Plaintiffs in the Federal Derivative Actions engaged in a
27 virtual mediation with Michelle Yoshida, who also served as the mediator in the related, securities
28 class action *Bernstein v. Ginkgo Bioworks Holdings, Inc.,* No. 4:21-cv-08943-KAW ("Securities

1  Action"). (Pls.' Mot. at 1 n. 4, 7.)  On September 30, 2024, counsel for Plaintiffs in the Derivative

2  Actions participated in a full-day, in-person mediation session in New York City before the

3  Mediator, along with counsel for Ginkgo and the Individual Defendants. (Bottini Decl. ¶ 26.)  In

4  advance of the mediation, Plaintiffs in the Derivative Actions prepared and submitted a detailed

5  mediation statement and prepared and served a global settlement demand upon Defendants. *Id*.

6        While no resolution was reached at the conclusion of either mediation session the Parties

7  continued their negotiations and engaged in facilitated discussions regarding the strengths and

8  weaknesses of the claims and defenses at issue. (Bottini Decl. ¶ 27.)  The Settling Parties

9  continued to exchange information, documents, and detailed written settlement proposals and

10 counterproposals, debating the merits of the proposals in numerous communications between the

11 Settling Parties' counsel and the Mediator.  *Id.*

12       From January 2024 to February 2025, Plaintiffs' Counsel had numerous discussions with

13 Defendants' counsel and the Mediator regarding settlement issues and to request additional

14 information. (Bottini Decl. ¶ 28.)  On February 8, 2025, the Mediator made a double-blind

15 recommendation concerning the cash component of the Settlement, in the amount of $4,125,000,

16 which the Settling Parties accepted. *Id.*  At the same time, the Settling Parties agreed on the

17 corporate governance reforms to be adopted by the Company in connection with the Settlement

18 (Stipulation, Bottini Decl., Ex. 1 ¶ 2.5), as well as the valuable Contract Termination (Stipulation

19 ¶ 2.2). (Bottini Decl. ¶ 28.)

20       After reaching agreement on the Settlement Amount, Reforms, and Contract Termination,

21 the Settling Parties negotiated and ultimately agreed upon the amount of attorneys' fees and

22 expenses to be paid to Plaintiffs' counsel, subject to Court approval, in consideration for the

23 substantial benefits conferred upon Ginkgo and Current Ginkgo Stockholders by the Settlement.

24 (Bottini Decl. ¶ 29 (citing Stipulation ¶ 3.1).)

25       On February 19, 2025, the parties informed the Court that they had reached a settlement in

26 principle and requested that all case deadlines be suspended to allow them to finalize the

27 settlement. (Dkt. No. 63.)  The request was granted. (Dkt. No. 64.)  On May 27, 2025, Plaintiffs

28 filed the instant motion for preliminary approval of the class settlement. (Pls.' Mot., Dkt. No. 69.)

### D.     Terms of the Settlement

The proposed settlement agreement ("Stipulation") resolves the claims Plaintiffs have asserted on behalf of Ginkgo in this action. Under the terms of the settlement agreement, the Individual Defendants agree to pay $4.125 million to Ginkgo, addresses the core concerns raised in the Derivative Actions, and offers Ginkgo and its shareholders the benefit of the substantial and targeted Reforms to be implemented and maintained by Ginkgo for at least three years, including the adoption of enhanced oversight and disclosure procedures for related person transactions, implementation of enhanced employee training in related person transactions and disclosures, enhancement of the Audit Committee of the Ginkgo's Board of Directors (the "Board"), enhancement of the Disclosure Committee, and enhancement of Ginkgo's internal audit and financial oversight functions. (Bottini Decl. ¶ 30; Stipulation ¶ 2.5.)  In addition, the Company will terminate the contract through which it has historically incubated new operating companies or "OpCos" via a third-party service provider (*i.e.,* the "Contract Termination"). (Bottini Decl. ¶ 30; Stipulation ¶ 2.2.)  The Settling Parties estimate that the Contract Termination will have a value to Ginkgo in the form of savings of fees under the contract and other associated costs savings totaling approximately $3-4 million over at least the next three years. *Ids.*

The Settling Parties acknowledge and agree that Plaintiffs' litigation and settlement efforts in the Derivative Actions caused the payment of the Settlement Amount and the Contract Termination and were a substantial factor in the Ginkgo Board's agreement to adopt the Reforms. (Bottini Decl. ¶ 31; Stipulation ¶¶ 2.3-2.4.)  The Settling Parties further acknowledge and agree that these Reforms confer substantial benefits on the Company and Current Ginkgo Stockholders and that the Settlement on the terms set forth herein is in all respects fair, reasonable, and adequate, and serves the best interests of the Company and current Ginkgo Stockholders, supporting preliminary, and ultimately final, approval of the Settlement. (Stipulation ¶ 2.4.)

After agreeing upon the principal terms of the Settlement, the Settling Parties negotiated the payment of attorneys' fees and costs in the amount of $2,750,000, subject to court approval, in recognition of the substantial benefits provided to Ginkgo as a result of the prosecution and Settlement of the Derivative Actions. (Bottini Decl. ¶ 32; Stipulation ¶ 3.1.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 23.1, "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). Rule 23, in turn, "governs a district court's analysis of the fairness of a settlement of a shareholder derivative action." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. 12-cv-06003-CRB, 2015 WL 1153864, at *3 (N.D. Cal. Mar. 13, 2015); *see also In re Cadence Design Sys., Inc. Sec. Litig.*, No. 08-cv-4966 SC, 2011 WL 13156644, at *2 (N.D. Cal. Aug. 26, 2011) ("Within the Ninth Circuit, Rule 23's requirements for approval of class action settlements apply to proposed settlements of derivative actions." (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995))). Accordingly, "[c]ourts considering settlements of derivative actions have generally found '[c]ases involving dismissal or compromise under Rule 23(e) of nonderivative cases ... relevant by analogy." *Lloyd v. Gupta*, No. 15-cv-04183-MEJ, 2016 WL 3951652, at *4 (N.D. Cal. July 22, 2016) (second and third alterations in original) (quoting 7C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1839 (3d ed. 2007)). The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

Rule 23 requires courts to follow a two-step process in evaluating a class action or derivative action settlement. First, the parties must show "that the court will likely be able to ... (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). In other words, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" when considering the factors set out in Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2). The court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citation omitted). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *City of Seattle*, 955 F.2d at 1276 (citation omitted).

Second, if the court preliminarily approves a derivative action settlement, notice "must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). The court must then hold a hearing to make a final determination whether the settlement is "fair,

8

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

Within this framework, preliminary approval of a settlement is appropriate if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware*, 484 F. Supp. 2d at 1079 (citation omitted). The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with counsel's fiduciary obligations to the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). To assess a settlement proposal, courts must balance a number of factors:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026 (citations omitted). The proposed settlement must be "taken as a whole, rather than the individual component parts," in the examination for overall fairness. *Id.* Courts do not have the ability to "delete, modify, or substitute certain provisions"; the settlement "must stand or fall in its entirety." *Id.* (citation omitted).

### III.  DISCUSSION

#### A.  Preliminary Approval Factors

##### i.  Procedural Concerns

In the class action context, the Court must consider whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)-(B). As the Advisory Committee notes suggest, these are "matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A)-(B) advisory committee's note to 2018 amendment.

### a. Adequate Representation

Like class representatives, "a stockholder who brings suit on a cause of action derived from the corporation ... sues, not for himself alone, but as representative of a class comprising all who are similarly situated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949).

Here, Plaintiffs and their counsel have "prosecute[d] the action vigorously on behalf of the [shareholders]." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). Prior to reaching the settlement, Plaintiffs' counsel conducted a lengthy investigation, which included reviewing SEC filings, public statements, articles, and securities, reviewing Company contracts and existing governance policies, and reviewing thousands of pages of discovery produced in the Securities Action, the Federal Derivative Actions, and the Delaware Chancery Action. (Pls.' Mot. at 12.) Under these circumstances, the Court is satisfied that they possessed "sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (citation omitted). Accordingly, this factor weighs in favor of approval.

### b. Arm's Length Negotiation

Next, the Court considers how the parties arrived at the settlement, specifically whether the settlement was "the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 965 (9th Cir. 2009). Here, the Settlement was the product of multiple sessions of negotiations supervised by mediator Michelle Yoshida, and some of which was done in connection with the Securities Action. (Bottini Decl. ¶¶ 24-28.) The Court finds that the parties reached the settlement via an arms-length, non-collusive, negotiated resolution, and that this factor weighs in favor of preliminary approval.

### ii. Substantive Concerns

#### a. Strength of Plaintiffs' Case, Risks of Continuing Litigation, and Settlement Amount

Consistent with Rule 23's instruction to consider "the costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), courts in this circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation," Hanlon, 150 F.3d at 1026. In addition, though not articulated as a separate factor in Rule 23(e), "[t]he relief that the

10

settlement is expected to provide to [the company] is a central concern." Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory committee's note to 2018 amendment. To evaluate the adequacy of the settlement amount in light of the case's risks, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware*, 484 F. Supp. 2d at 1080. But "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982).

Here, the risk, expense, complexity, and likely duration of further litigation weigh in favor of preliminary approval. At the time of settlement, both plaintiffs had pending motions to dismiss on the threshold issue of demand futility. (Pls.' Mot. at 19.) Even if Plaintiffs survived the pending motions, the Board would then have the ability to appoint a special litigation committee tasked with investigating the claims and determining whether to permit the plaintiffs to prosecute the claims or terminate the litigation. *Id.* (citing *Johnson v. Hui*, 752 F. Supp. 909, 913 (N.D. Cal. 1990).) As Plaintiffs explain, even if they later

> defeat[ed] the recommendation of a Special Litigation Committee, the challenges remain daunting, including, *inter alia*, (i) building a circumstantial case for liability based upon thousands of complex business and financial documents; (ii) proving actual damages in a battle of the experts; (iii) overcoming motions for summary adjudication; (iv) securing a favorable judgment at trial through circumstantial evidence comprised of complex corporate documents and the testimony of predominantly hostile percipient witnesses and contested expert testimony; (v) maintaining that judgment through post-trial motions and appeals; and (vi) enforcing any judgment as might be obtained.

(Pls.' Mot. at 19-20.) As a result, courts in this district have generally recognized that it is often difficult for plaintiffs to prevail in derivative actions and on securities fraud claims. *See, e.g., Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020) ("Courts have recognized that, in general, securities actions are highly complex and that securities class litigation is notably difficult and notoriously uncertain." (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2018 WL 6168013, at *15)); *In re Oclaro, Inc. Derivative Litig.*, No. C-11-3176 EMC, 2014 WL 4684993, at *2 (N.D. Cal. Sept. 19, 2014) ("[A]s other courts have commented, it

11

is generally difficult to prevail in a derivative suit.").

With those risks in mind, the Court considers the financial settlement of $4.125 million, and additional value of the Contract Termination, which is expected to save Ginkgo $3-4 million over the next three to four years. (Pls.' Mot. at 15.) The accumulating costs of litigation could significantly mitigate the value of a judgment on the merits. *Cf. In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest.") (quoting *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978)). The Court notes that the settlement also included significant Reforms designed to prevent recurrence of the alleged misconduct and further damage to Ginkgo, including new auditing and disclosure requirements, and which, for that reason, provide substantial benefit to shareholders. (*See* Stipulation ¶¶ 2.4-2.5; Pls.' Mot. at 15-16.)

Accordingly, given the risks described above, the Court finds that the Settlement amount of $4.125 million, plus the estimated costs savings and the implementation of the agreed upon reforms, is reasonable and weighs in favor of preliminary approval.

### b. Terms of Attorneys' Fees

"For more than two decades, the Ninth Circuit has set the 'benchmark for an attorneys' fee award in a successful class action [at] twenty-five percent of the entire common fund.' " *Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2018 WL 4030558, at *3 (N.D. Cal. Aug. 23, 2018) (quoting *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)).

The Settling Parties agreed to pay Plaintiffs' Counsel attorneys' fees and expenses in the amount of $2,750,000, subject to court approval. (Stipulation ¶ 31.) While this amount exceeds the 25% benchmark, the Court understands that the settlement agreement requires the implementation of significant Reforms and the Contract Termination, which involves an estimated costs savings of $3-4 million. (*See* Pls.' Mot. at 8-9.) Taken together, the financial award and the costs savings total approximately $7-8M, even before accounting for the impact of the Reforms. The Court will decide reasonableness at the final approval stage, and the parties will be expected

12

to explain why deviation from the 25% bench is appropriate at that time. The Court also expects counsel to provide additional information at the final approval stage, including the breakdown of hours spent by each attorney and substantive information regarding their legal experience to support their billing rates under a lodestar analysis. Such information is necessary to fulfill the Court's "independent obligation to ensure that the [attorney's fees] award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.

Accordingly, the Court finds that, at the preliminary approval stage, the amount of attorneys' fees does not weigh against approval.

### c. Preferential Treatment

Plaintiffs intend to seek a total of $8,000 in service awards, or $2,000 each, which includes Mssrs. Newman and Moskowitz in the Delaware Chancery Action. (Stipulation ¶ 3.3.) The awards, if approved, will be paid from Plaintiffs' Counsel's attorneys' fees. *Id.*

The Ninth Circuit has recognized that service awards to named plaintiffs in a class action are permissible and do not necessarily render a settlement unfair or unreasonable. *See, e.g., Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Derivative plaintiffs may likewise merit compensation "for work done on behalf of the [shareholders]." *Id.*; *see also In re Galena Biopharma*, 2016 WL 3457165, at *12 (approving incentive award to derivative action lead plaintiffs). In this district, the presumptively reasonable amount for service awards is $5,000. *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases).

Thus, while the Court finds that the $2,000 service award to be presumptively reasonable, the matter will be decided in connection with final approval.[3]

### d. Experience and Views of Counsel

Plaintiffs' counsel has significant experience obtaining favorable results as lead counsel in

---

[3] Lead Plaintiffs will need to address why Mssrs. Newman and Moskowitz should receive service awards in connection with final approval despite not having been appointed as lead plaintiffs and must include legal authority for providing service awards in this situation.

13

shareholder derivative litigation. (*See* Decl. of Francis A. Bottini, Jr. ISO of Mot. to Consolidate, *Hu,* Dkt. No. 33-1 ¶¶ 8-13.)  "[A]lthough a court might give weight to the fact that counsel for the class or the defendant favors the settlement, the court should keep in mind that the lawyers who negotiated the settlement will rarely offer anything less than a strong, favorable endorsement." *Principles of the Law of Aggregate Litigation* § 3.05 cmt. a (Am. Law. Inst. 2010). Thus, while the fact that counsel advocates in favor of this settlement weighs in favor of its approval, the Court gives it little weight. *See In re Wells Fargo & Co. Sharehold Derivative Litig.*, No. 16-CV-05541-JST, 2019 WL 13020734, at *8 n. 9 (N.D. Cal. May 14, 2019).

### iii.  Reaction of Shareholders to the Proposed Settlement

Like other courts in this district, the Court will wait until the final approval hearing to determine shareholders' reaction to the settlement. *See In re Wells Fargo & Co. Sharehold Derivative Litig.*, No. 16-CV-05541-JST, 2019 WL 13020734, at *8 (N.D. Cal. May 14, 2019).

### iv.  No Obvious Deficiencies

The Court has reviewed the settlement and did not find any obvious deficiencies. To the extent any shareholder calls attention to any such deficiency, the Court will consider it at the final approval hearing.

## B.  Notice Plan

The Court must separately evaluate the proposed notice procedure. Rule 23.1(c) requires that notice of the Settlement "must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). In determining the appropriate notice method, "the Court considers whether such notice would be sufficient to reach the majority of interested stockholders." *Bushansky v. Armacost*, No. 12-CV-01597-JST, 2014 WL 2905143, at *6 (N.D. Cal. June 25, 2014) (citing Wright & Miller, Federal Practice & Procedure § 1839).

The parties propose to provide notice through requiring Ginkgo to (1) post the Long Form Notice on Ginkgo's Investor Relations webpage with the Stipulation of Settlement (and exhibits thereto) and maintain these documents until after the Final Approval Hearing, (2) publish via GlobeNewswire or similar wire service with a link to its Investor Relations webpage and the Stipulation (and exhibits thereto), and (3) file with the U.S. Securities and Exchange Commission

the Notice and Stipulation (with corresponding exhibits) as exhibits to a Current Report on either Form 8-K or 10-Q. (Stipulation ¶ 4.1)[4] Courts have found that similar procedures satisfy Rule 23.1 and due process. *See In re ImmunityBio, Inc. Shareholder Derivative Litigation*, No. 3:24-CV-02014-GPC-VET, 2025 WL 2147066, at *3 (S.D. Cal. July 29, 2025) (allowing notice through online publication); *see also In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 608 (9th Cir. 2017) (affirming district court's approval of "notice procedures, which included placing notice of the settlement on two consecutive days in The New York Times, Investor's Business Daily, The Wall Street Journal, and The San Francisco Chronicle, filing an 8-K with the SEC, and publishing the notice on its website"); *Bushansky*, 2014 WL 2905143, at *6 (collecting cases). The Court reaches the same conclusion here.

Upon review of the Long Form and Summary Notices, the Court finds that they do not adequately explain how to file an objection with the Court. As a result, page 19 of the proposed Long Form Notice and pages 3-4 of the Summary Notice must be amended as follows (changes are underlined):

**A. You Must Make Detailed Objections in Writing <u>and File with the Court</u>**

Any objections must be presented in writing and must contain the following information:

1. Notice of whether you intend to appear at the Settlement Hearing;

2. Your name, legal address, and telephone number;

3. Proof of being a Current Ginkgo Stockholder as of the Record Date and representation that you will continue to own Ginkgo common stock as of the date of the Settlement Hearing;

4. The date(s) you acquired your Ginkgo shares and the number of Ginkgo shares held;

5. A detailed statement of your specific position with respect to the matters to be heard at the Settlement Hearing, including a statement of each objection being made; and

6. The grounds for each objection or the reasons for your desire to appear and to be heard.

---

[4] At the hearing, defense counsel clarified that Ginkgo would file either SEC Form 8-K or 10-Q.

> <u>All written objections and supporting papers must (a) clearly identify the case name and number ( *Hu v. Baker*, Case No. 23-cv-02077-KAW), (b) be submitted to the Court either by filing them electronically or in person at any location of the United States District Court for the Northern District of California or by mailing them to the Class Action Clerk, United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, and (c) be filed or postmarked on or before _____, 2025.</u>"
> The Court will not consider any objection that does not substantially comply with these requirements. Any counsel retained by a purported objector for the purpose of asserting an objection must make a notice of appearance on the Court by \_\_\_\_\_, 2025, which is fourteen (14) days prior to the Settlement Hearing. <u>If you appear through your own attorney, you are responsible for hiring and paying that attorney.</u>

Second, the Court strikes the requirement that objections to the settlement be separately sent to counsel as listed. (Long Form at 19, § D; Summary Notice at 4.) The Court finds that the requirement to mail courtesy copies to be unnecessarily onerous, considering that counsel will receive an electronic notice of any objection filed with the Court. If counsel receives any written objections from shareholders, they are directed to electronically file them on the public docket.

Finally, regarding SEC disclosure, the Court will require Ginkgo to file a Form 8-K within 21 days of this order. The SEC filing is part of the notice plan, which should be completed well in advance of the filing of the motion for final approval, so that shareholders have a meaningful opportunity to object. Requiring Form 8-K also allays any concern the Court may have that publication by wire service notice will not reach all shareholders.

Otherwise, the Court finds that the content of the proposed notice "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Hewlett-Packard*, 716 F. App'x at 609 (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that preliminary approval is warranted, and, therefore, GRANTS preliminary approval of the parties' proposed Settlement Agreement and Notice Plan.

For settlement purposes only, the Court APPOINTS Dr. Hu and Mr. Bowers as Lead Plaintiffs; and Bottini & Bottini, Inc. as Lead Counsel. The Court sets the following schedule:

| Action: | Date: |
|---|---|
| Ginkgo to post Long Form Notice and Stipulation of Settlement (with exhibits) to Ginkgo's website | 14 days from the date of this order |
| Ginkgo to disseminate Summary Notice via wire service | 14 days from the date of this order |
| Gingko shall file SEC Form 8-K with the SEC to disclose the Settlement | 21 days from the date of this order |
| Defendants' Counsel shall file declaration confirming compliance with the Notice Plan | November 3, 2025 |
| Plaintiffs to file Motion for Final Settlement Approval and Lead Counsel to file Motion for Attorneys' fees, costs, and service awards | November 3, 2025 |
| Deadline for Shareholders to file Objections to Settlement and/or Fee and Expense Application | December 4, 2025 |
| Reply papers to any requests for exclusion or objections | December 11, 2025 |
| Final Approval Hearing | December 18, 2025, at 1:30 p.m. |

IT IS SO ORDERED.

Dated: August 21, 2025

_____
KANDIS A. WESTMORE
United States Magistrate Judge

17